TODD ANDREW SPODEK, ESQ.
NY Reg. #4489399
Spodek Law Group, P.C.
233 Broadway, Rm. 710
New York, New York 10279-0700
Telephone: (212) 300-5196
Email: ts@spodeklawgroup.com

Attorney for Defendant
ROBINSON VASQUEZ GERMOSEN

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff

ROBINSON VASQUEZ GERMOSEN,

Defendant.

Case Number: 1:25-cr-00346-KAM
DATE OF SERVICE (BY EMAIL):
MAY 22, 2026

_____

NOTICE OF MOTION TO DISMISS COUNT 1 OF THE SUPERSEDING INDICTMENT

PLEASE TAKE NOTICE that Defendant ROBINSON VASQUEZ GERMOSEN ("Mr.

Vasquez"), by his attorney Todd Andrew Spodek, of Spodek Law Group, P.C., will move this

Court, before the Honorable Kiyo A. Matsumoto, United States District Judge for the Eastern

District of New York, at a date and time to be designated by the Court, for an order dismissing

Count 1 of the Indictment, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for

failure to state an offense.

Dated: May 22, 2026.

Respectfully submitted,

s/ Todd Andrew Spodek

_____
TODD ANDREW SPODEK, ESQ.
NY Reg. #4489399
Spodek Law Group, P.C.
233 Broadway, Rm. 710

1

New York, New York 10279-0700
Telephone: (212) 300-5196
Email: ts@spodeklawgroup.com
Attorney for Defendant
ROBINSON VASQUEZ GERMOSEN

To: AUSA Eric W. Silverberg
    AUSA Sean Michael Sherman
    AUSA Sarah Evans
    Christos Nicholas Georgalis, Esq.
    For Defendant, Luis Leandro Ortiz Ribera
    Lindsey K. Gerdes, Esq.
    For Defendant, Emmanuel Clase de la Cruz

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that certify that on May 22, 2026, I served Defendant Robinson

Vasquez Germosen's Notice of Motion to Dismiss Count 1 of the Indictment and Memorandum

in Support via email to the parties listed on the Notice of Motion. I further certify that on this

22nd day of May, 2026, I served all counsel of record via the Court's electronic filing system.

s/ Todd Andrew Spodek

_____

TODD ANDREW SPODEK, ESQ.
NY Reg. #4489399
Spodek Law Group, P.C.
233 Broadway, Rm. 710
New York, New York 10279-0700
Telephone: (212) 300-5196
Email: ts@spodeklawgroup.com
Attorney for Defendant
ROBINSON VASQUEZ GERMOSEN
TODD ANDREW SPODEK, ESQ.

TODD ANDREW SPODEK, ESQ.
NY Reg. #4489399
Spodek Law Group, P.C.
233 Broadway, Rm. 710
New York, New York 10279-0700
Telephone: (212) 300-5196
Email: ts@spodeklawgroup.com
Attorney for Defendant
ROBINSON VASQUEZ GERMOSEN

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff

ROBINSON VASQUEZ GERMOSEN,

                Defendant.

_____/

Case Number: 1:25-cr-00346-KAM
DEFENDANT, ROBINSON VASQUEZ
GERMOSEN'S MOTION
TO DISMISS COUNT 1 OF THE
SUPERSEDING INDICTMENT

ROBINSON VASQUEZ GERMONSEN'S MOTION TO DISMISS COUNT 1 THE
SUPERSEDING INDICTMENT (WIRE FRAUD CONSPIRACY) AND MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS

COMES NOW, the Defendant, ROBINSON VASQUEZ GERMOSEN'S ("Mr.

Vasquez"), by and through his undersigned attorney, and, moves this Honorable Court to dismiss

Count 1 of the Superseding Indictment, as it relates to Mr. Vasquez, for its failure to state a

criminal offense, and as grounds in support of this Motion, states that:

Table of Contents

INTRODUCTION                                          5-6

BACKGROUND                                         6-11

LAW AND ARGUMENT                              11-20

CONCLUSION                                           20

Table of Authorities

3

| | |
|---|---|
| *Carpenter v. United States*, 484 U.S. 19, 26 (1987) | 14 |
| *Ciminelli v. United States*, 598 U.S. 306 (2023) | 5, 6, 13, 15-19, 26 |
| *Cleveland v. United States*, 531 U.S. 12 (2000) | 13, 14, 18, 19 |
| *Kelly v. United States*, 590 U.S. 391 (2020) | 19 |
| *McNally v. United States*, 483 U.S. 350 (1987) | 13, 14 |
| *Murphy v. Nat'l Collegiate Athl. Ass'n*, 584 U.S. 453 (2018) | 18, 19 |
| *United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012) | 11 |
| *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015) | 16, 17 |
| *United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019) | 16 |
| *United States v. Chastain*, 145 F.4th 282 (2d Cir. 2025) | 19 |
| *United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) | 15, 16 |
| *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) | 11, 12 |
| *United States v. Peraire-Bueno*, No. 24 Cr. 293, 2025 WL 2062021 (S.D.N.Y. July 23, 2025) | |
| *United States v. Runner*, 143 F.4th 146 (2d Cir. 2025) | 11 |
| *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) | 15 |
| | |
| Fed. R. Crim. P. 12(b)(3)(B)(v) | 11 |
| 9 N.Y.C.R.R. § 5329.1 | 18 |
| 9 N.Y.C.R.R. § 5329.19 | 18 |
| 9 N.Y.C.R.R. § 5330.1 | 18 |
| 9 N.Y.C.R.R. § 5330.19 | 18 |
| N.Y. Racing, Pari-Mutuel Wagering & Breeding Law ("PML") § 104 | 19 |
| N.Y. PML § 1367 | 19 |

# I INTRODUCTION/PRELIMINARY STATEMENT

The government has billed this case as involving "insider betting" and "rigging" individual pitches in professional baseball games. Count I of the Superseding Indictment alleges something less headline-worthy: that some bettors broke certain sportsbooks' terms of use against wagering based on non-public information; specifically, information from two Major League Baseball pitchers – co-defendants, Messrs. Clase and Ortiz – that they were going to throw a particular pitch before it was actually thrown, so that a cadre of bettors, including, according to the Government, Mr. Vasquez, could use that information to place wagers on the pitches with betting platforms, which, other than a single unanticipated result, made the defendants and unnamed bettors money.

The government charged Mr. Vasquez with one count of wire fraud conspiracy (he is also charged in Count 5 with one count of lying to the Government during a proffer), because allegedly the betting platforms completed wagering transactions, they otherwise would not have honored. This theory of fraud has repeatedly been rejected and should be rejected again in this case.

The wire fraud conspiracy count does not state an offense. The Supreme Court, in *United States v. Ciminelli*, 509 U.S. 306 (2023) rejected using the wire fraud statute to criminalize schemes which rest exclusively on depriving someone of economic information necessary to make discretionary economic decisions, as opposed to depriving someone of a tangible property interest, *Id.* at 309. And that is the theory of fraud in this case. The indictment's characterization of the fraud is that the scheme deprived the sportsbooks of making informed decisions of accepting certain wagers because they were unaware that Messrs. Clase and Ortiz informed

5

others, including Mr. Vasquez, of this non-public information. This is the precise theory of fraud that the Supreme Court rejected in *Ciminelli.*

But even if a viable theory supported the indictment, the allegations would still fail to state an offense. While the statute refers broadly to material misrepresentations and omissions, the factual allegations are silent as to whether any defendant or co-conspirator actually made any such misrepresentation or failed to fulfill a duty to disclose. The only basis for any alleged misconduct is breaching the sportsbook rules themselves, rather than any cognizable theory of fraud. Courts have rejected extending such activity as covered by the wire fraud statute. Regardless of the underlying theory of fraud, Count one must therefore be dismissed.

## BACKGROUND

As discussed earlier in this Motion, Mr. Vasquez is currently charged with one count each of wire fraud conspiracy (Count 1 of the Superseding Indictment), and making a false statement (Count 5 of the Superseding Indictment). See doc 80.

The Superseding Indictment (Doc. 80) alleges that Defendant, Mr. Clase, a major league baseball pitcher during the relevant time frame (between May 2023 and June 2025), told Mr. Vasquez, that he was going to throw particular pitches. Mr. Vasquez would then tell bettors which pitches Mr. Clase was going to throw, so the bettors could place wagers on the pitches through sports betting platforms, knowing in advance that they'd likely win those bets since the person throwing the pitch, Mr. Clase, told Vasquez what pitches he was going to throw. Mr. Ortiz would receive a portion of the winnings. The Superseding Indictment further alleges that, in June 2025, Defendant, Mr. Ortiz, joined the scheme, and on two occasions, told Mr. Clase what pitches he was going to throw.

The Superseding Indictment alleges that Major League Baseball's rules and policies prohibit major league baseball players, including Messrs. Clase and Ortiz, from 1) wagering any amount of money on any baseball game in connection with which the player has a duty to perform; 2) asking others to place bets on their (the players') behalf; and 3) knowingly benefit financially from, or knowingly assist with bets placed by others. The players' contractual requirements with their team (the Cleveland Guardians) required Clase and Ortiz to abide by all Major League Baseball rules, including the prohibition on betting on baseball, owe a duty of loyalty to the Cleveland Guardians and pledge themselves to conform to high standards of personal conduct, fair play and good sportsmanship.

Paragraph 15 of the Indictment alleges that All bettors wagering on the Betting Platforms were required to agree to their terms of use (the "Terms of Use"), which provided, in sum, substance and in relevant part, that users were prohibited from (i) wagering in connection with sports contests or individual players' statistical performances if the users had access to any pre-release, confidential information or other information that was not available to all other wagerers, including any information provided by a professional athlete, such as non-public advance information about pitches; and 2) placing wagers as an agent or proxy for any individual other than the account holder.

The Superseding Indictment details several instances in which Mr. Clase, and to a far lesser extent, Mr. Ortiz, told others what pitches they were going to throw, and when they were going to throw them.

It is alleged that the bettors involved in this conspiracy won "at least" $450,000. It is also alleged that the scheme's participants used mobile devices to communicate, *inter alia*, information regarding pitches, bets to be made, winnings, and distribution of winnings.

Parenthetically, one of the mobile devices was a cell phone belonging to Mr. Vasquez, which was seized and searched pursuant to a search warrant.

Paragraph 24 of the Superseding Indictment alleges that, on May 19, 2023, Bettor-1 and several other Bettors received information from Mr. Clase concerning what pitch he was going to throw. There is no allegation that the information was given to or conveyed by Mr. Vasquez. Thus, paragraph 24 fails to allege any criminal conduct by Mr. Vasquez.

Paragraph 24 of the Superseding Indictment also alleges that Bettor-1 sent $1,000 to Mr. Vasquez. It is not alleged that the $1,000 was a portion of the proceeds the bettors won on May 19th, nor is it alleged that Mr. Vasquez was paid for doing anything illegal. Consequently, this further allegation in paragraph 24 fails to allege any criminal conduct, in particular, wire fraud, by Mr. Vasquez.

It's alleged in paragraph 25 of the Superseding Indictment, that on June 3, 2023, Mr. Clase conveyed pitch information to the redacted Defendant who then conveyed the information to Bettor-1. It is not alleged that Mr. Vazquez participated in this transaction, nor is it alleged that Mr. Vasquez was paid for doing anything illegal, so, like the allegations of paragraph 24, the allegations of paragraph 25 fail to allege any criminal conduct, in particular, wire fraud, by Mr. Vasquez.

Paragraph 26 also alleges that Mr. Clase tipped redacted Defendant who then conveyed the information to Bettor-1. It is not alleged that Mr. Vazquez participated in this transaction, nor is it alleged that Mr. Vasquez was paid for doing anything illegal. Thus, paragraph 26 fails to allege any criminal conduct by Mr. Vasquez.

Paragraph 27 of the Superseding Indictment alleges that on June 7, 2023, Mr. Clase pitch tipped Bettor-1 and several other bettors who used that information to win money from one of

the sports betting platforms. It is not alleged that Mr. Vazquez participated in this transaction, nor is it alleged that Mr. Vasquez was paid for doing anything illegal. Paragraph 27, like paragraphs 24, 25, and 26, fails to allege any criminal conduct by Mr. Vasquez.

Paragraph 31 of the Superseding Indictment alleges that, on June 13, 2023, the redacted Defendant provided Bettor-1 with the pitch Mr. Clase was going to throw which, two days later, resulted in Bettor-1 and other bettors winning money. It is not alleged that Mr. Vazquez participated in this transaction, nor is it alleged that Mr. Vasquez was paid for doing anything illegal. Then, paragraph 31 also fails to allege any criminal conduct by Mr. Vasquez.

Paragraphs 35, 39, 41, 42, 44, 48, 49, 50, 51, 52, 53, 54, 55, 56 and 58 of the Superseding Indictment, do not allege any wrongdoing by Mr. Vasquez.

With regard to the allegations of wrongdoing by Mr. Ortiz (paragraphs 48-58 of the Superseding Indictment), there is no mention that Mr. Vasquez had knowledge of Mr. Ortiz's intent to throw a particular pitch before the pitch was thrown, that Mr. Vasquez ever communicated with Mr. Ortiz or anyone else regarding the tipped pitches, that Mr. Vasquez bet on or won or was paid any money for any successful wager made on a tipped pitch thrown by Mr. Ortiz. Therefore, paragraphs 48-58 of the Superseding Indictment do not allege criminal conduct by Mr. Vasquez.

Paragraphs 44 through 46 recite wagers that were lost because the information conveyed by Mr. Clase that he was going to throw a ball didn't pan out when the batter swung and missed at the pitch. These paragraphs clearly do not allege wire fraud by Mr. Vasquez.

Paragraph 36 alleges that Mr. Clase, via text message, confirmed with Bettor-1 that Bettor-1 had won money on a wager (though, what the wager involved and when it was made, is absent from paragraph 36), and that Bettor-1 should send some of the money to an unidentified

recipient in the Dominican Republic. According to the Indictment, Bettor-1 sent a copy of Mr. Clase's text to Mr. Vasquez who then received $5,840 from 3 bettors, including Bettor-1. There is no allegation that Mr. Vasquez conveyed the pitch information from Mr. Clase to anyone, that Mr. Vasquez was aware of the pitch information, whom the information had been conveyed to, or that the $5,840 was the product of Mr. Vasquez's having received inside information regarding what pitch Clase was going to throw. Paragraph 36, therefore, fails to allege criminal conduct by Mr. Vasquez.

Paragraph 37 alleges that on May 17, 2025, Mr. Vasquez, and other bettors won money by placing bets on a pitch thrown by Mr. Clase. It is not alleged that Mr. Vasquez knew, in advance, what the pitch was going to be. Indeed, all paragraph 37 alleges is that Mr. Clase sent Bettor-1 if he was "ready." These allegations fail to establish a violation of the wire fraud statute by Mr. Vasquez.

Paragraph 40 alleges that, on April 25, 2025, Bettor-1 visited Mr. Clase at his home and, on April 26, 2025, attended one of Mr. Clase's games using tickets Mr. Clase had left for him. The paragraph further alleges that, during the game, Mr. Clase texted Bettor-1, after which Bettor-1 spoke with Mr. Clase by phone, and that shortly thereafter Bettor-1 and other bettors won money wagering that Mr. Clase would throw a particular pitch. Though it is alleged that Bettor-1 later sent $3,200 to Mr. Vasquez, the Indictment fails to allege that the money was a portion of the proceeds the bettors won on April 26th, nor is it alleged that Mr. Vasquez was paid for doing anything illegal. Therefore, paragraph 40 does not allege a violation of the wire fraud statute by Mr. Vasquez.

Paragraph 43 of the Superseding Indictment alleges that after receiving information from Mr. Clase concerning what pitch he was going to throw, Mr. Vasquez, Bettor-1 and several other

bettors used that information to win money on one of the sports betting platforms. This is the only allegation that, at first blush, establishes a violation of the wire fraud statute by Mr. Vasquez; however, as will be discussed *infra*, there is no violation sufficiently alleged because the crux of the purported crime was a violation of the terms and conditions of the betting platform that was used to book the wager and pay the winnings – something that is not contemplated by the wire fraud statute. Moreover, and as will also be argued, *infra*, the purported "scheme" did not constitute a scheme to deprive people of "traditional property interests," and using the wire fraud statute to punish someone for violating the terms and conditions of a betting platform constitutes an overuse of federal fraud statutes.

## LAW AND ARGUMENT

### Legal Standard

An indictment must "state the essential elements of the charge." *United States v. Runner*, 143 F.4th 146, 156 (2d Cir. 2025); see also Fed. R. Crim. P. 7(c)(1) ("The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged…"). This requirement ensures the defendant is "tried on the evidence presented to the grand jury," and, as an "important corollary," allows the Court to "evaluate whether [the] facts alleged could support conviction." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (citing *Russell v. United States*, 369 U.S. 749, 768–70 (1962)); see also U.S. Const., amends. V, VI.

A defendant may challenge an indictment for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). An indictment may fail to state an offense in two ways. First, an indictment must be dismissed if it "fails to allege the essential facts constituting the offense charged." *Pirro*, 212 F.3d at 91. Second, "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76

(2d Cir. 2012). In other words, an indictment is legally insufficient where the alleged conduct does "not constitute an offense." *Id.* at 76.

Because Mr. Vazquez has challenged the indictment before trial, he is "entitled to a more exacting review." *Pirro*, 212 F.3d at 92. In carrying out this review, the Court must consider the indictment "as it was actually drawn, not as it might have been drawn." *Id.* And where, as here, a statute "includes generic terms," it is not enough that the indictment repeats those terms - "it must descend to particulars." *Id.* at 93 (quoting *Russell*, 369 U.S. at 765).

**On their face, paragraphs 24, 25, 26, 27, 31, 35, 36, 37, 39, 41, 42, 44, 46, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 fail to allege a violation of the wire fraud statute by Mr. Vasquez.**

For the reasons stated earlier in this Motion, the foregoing paragraphs of the Superseding Indictment do not allege a violation of the wire fraud statute by Mr. Vasquez.

**All of the allegations against Mr. Vasquez do not constitute a scheme to deprive people of "traditional property interests," and using the wire fraud statute to punish someone for violating the terms and conditions of a betting platform constitutes an overuse of federal fraud statutes.**

The government charges Mr. Vasquez with participating in a conspiracy to commit wire fraud. In essence, the government's theory is that, by stating that certain wagers were placed in accordance with the Betting Companies' rules, or failing to disclose that they were not, defendants and co-conspirators deprived the Betting Companies of their right to decide whether to enter into certain transactions. That is, they deprived the Betting Companies of valuable economic information that affected their economic decision-making.

This theory, previously adopted by the Second Circuit, is no longer sound. The Supreme Court rejected this "right-to-control" in *Ciminelli v. United States*, 598 U.S. 306 (2023). *Ciminelli* involved politically connected insiders tailoring the bidding process for state-funded development projects to favor related companies, depriving the sponsoring entity of the "potentially valuable economic information" that would inform the entity's decision-making. *Id.* at 310–11; *United States v. Percoco*, 13 F.4th 158, 171 (2d. Cir. 2021), *rev'd sub nom. Ciminelli v. United States*, 598 U.S. 306 (2023). The government relies on the same theory here, alleging that Mr. Vasquez and co-conspirators deprived the betting companies of information that would inform their decision to accept (or reject) those wagers.

Not only does the government's theory contravene recent—and unequivocal – Supreme Court precedent, it represents precisely the kind of overreach the Court has cautioned against for decades. In charging violations of state-licensed Betting Companies' rules as federal wire fraud, the government asks this Court to read the wire fraud statute to place "conduct traditionally policed by States under federal superintendence." *Ciminelli*, 598 U.S. at 316 (citing *Cleveland v. United States*, 531 U.S. 12, 27 (2000)). The Court should, therefore, reject the government's invitation and dismiss the indictment.

**A wire fraud conspiracy must involve a scheme to deprive a person of a traditional property interest.**

Beginning with *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court has become increasingly wary of the government's - and the courts' -expansive interpretations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343. Now, the statutes' scope is clear: they protect only "traditional property interests." *Ciminelli*, 598 U.S. at 309. The narrowing of the

federal fraud statute proceeded in multiple steps. The first step came in *McNally*. In *McNally*, the Court held that the mail fraud statute did not encompass the "intangible right of the citizenry to good government." 483 U.S. at 356. Shortly after *McNally*, in

*Carpenter v. United States*, 484 U.S. 19 (1987), the Court determined that certain intangible property, such as "confidential business information" had "long been recognized as property" and were therefore within the mail and wire fraud statutes' reach. *Id*. at 26. At the same time, the Court reaffirmed that a "contractual right" to "honest and faithful service" was not. *Id*. at 25. That interest was "too ethereal" to be the kind of "individual property right[]" the statutes protect. *Id.* Shortly after *McNally* and *Carpenter*, Congress enacted the honest-services statute, 18 U.S.C. § 1346 to cover just one of the intangible rights that courts had protected under the mail fraud statute before *McNally*. *See Cleveland*, 531 U.S. at 19-20 (explaining the history of the federal fraud statutes).

Later, in *Cleveland v. United States*, 531 U.S. 12 (2000), the Court reiterated that the federal fraud statutes criminalize only schemes to deprive people of "traditional property interests." It, therefore, vacated the defendant's conviction for making false statements in his video poker license application, which the Court viewed as an exercise of the state's regulatory power, not property. *Cleveland*, 531 U.S. at 26–27. But as the Court observed, there was another important reason to reject the government's theory: approving it would result in "a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." *Id.* at 24. In declining to do so, the Court explained that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes." *Id.* at 25 (quoting *Jones v. United States*, 529 U.S. 848, 858 (2000)).

Finally, in 2023, the Supreme Court dealt what should have been the decisive blow to prosecutions like this one. In *Ciminelli v. United States*, the Supreme Court was called upon to determine whether the "right to control" theory was a valid basis for criminal liability under the wire fraud statute. 598 U.S. 306, 308 (2023). Under this theory, a defendant could be guilty of wire fraud if he schemed "to deprive the victim of 'potentially valuable economic information' 'necessary to make discretionary economic decisions.'" *Id.* (quoting *Percoco*, 13 F.4th at 170). The Second Circuit had explained the theory this way: because the right to control an asset is a "defining feature of most property," *United States v. Lebedev*, 932 F.3d 40, 48 (2d Cir. 2019), "the withholding or inaccurate reporting of information that could impact on economic decisions [could] provide the basis for a mail [or wire] fraud conviction." *United States v. Wallach*, 935 F.2d 445, 462–63 (2d Cir. 1991); *see United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (mail fraud and wire fraud statutes analyzed in same way).

This, however, is no longer the case. In *Ciminelli*, the Court rejected the right to control theory as inconsistent with the federal fraud statutes' text, history, and structure. Starting with the text and the history, the theory could not be "squared with the text of the federal fraud statutes" because the "right to control" is not an "interest that had 'long been recognized as property' when the wire fraud statute was enacted." *Ciminelli*, 598 U.S. at 314. The right-to-control theory was also inconsistent with the statutes' structure. *Id.* at 315. As the Court observed, Congress revived "the intangible right of honest services" when it enacted § 1346. *Id.* Its "reverberating silence" about other intangible interests "foreclose[d]" the use of the wire fraud statute to "cover the intangible right to control." *Id.* Accordingly, allegations that defendants conspired to deprive a person of the right to valuable economic information needed to make discretionary economic decisions cannot support a federal wire fraud conspiracy charge.

This is not to say that sports betting platforms are without recourse when their terms of use are violated—they can void bets, pursue civil remedies, or seek state prosecutor involvement. But *Ciminelli* puts to rest the notion that federal prosecutors are here to enforce contractual agreements between bettors and platforms.

**Because the indictment alleges a scheme aimed at depriving the Betting Companies of economically valuable information, the wire fraud conspiracy count must be dismissed.**

According to the Superseding Indictment, certain defendants and co-conspirators failed to disclose to the betting platforms that they either (i) had relevant non-public information or (ii) were placing wagers for others. As a result, the betting companies completed wagering transactions they might not have had they been fully informed. In other words, the Indictment charges the defendants and co-conspirators with depriving the betting companies of information that could have influenced the companies' decisions to accept the wagers and pay out, or not. The Supreme Court rejected this theory in *Ciminelli*, as should this Court.

It is not enough that the government alleges that the wagers were placed "for profit." After all, the profit motive was present in right-to-control cases too. *See Percoco*, 13 F 4th. at 172 (defendants rigged request-for-proposal process to make it more likely that their companies would receive development contracts); *United States v. Calderon*, 944 F.3d 72, 80–81, 85–88 (2d Cir. 2019); *Lebedev*, 932 F.3d at 46–49 (defendant assisted company in misrepresenting Bitcoin exchange's business so that banks and credit card companies would process its transactions); *United States v. Binday*, 804 F.3d 558, 565–66 (2d Cir. 2015) (defendant and co-conspirators used straw buyers to apply for insurance policies and received profit in the form of commissions, among other things).

16

What matters is the object of the fraud, not the ultimate result. According to the indictment, the object was to place wagers while withholding information relevant to the betting companies' decision to accept those wagers. *Percoco*, 13 F.4th at 170 (quoting *Binday*, 804 F.3d at 579) ("In a right-to-control case. . . it suffices that a defendant intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision."). In other words, the object of the scheme was to place wagers without disclosing to the betting companies all of the relevant facts.

In *Percoco*, the court concluded that the defendants had deprived the victim of "potentially valuable economic information that would have resulted from a legitimate and competitive RFP process." 13 F.4th at 172. Because depriving the victim of that information was "precisely the object of defendants' fraudulent scheme," the court affirmed the conviction under the right-to-control theory. *Id.* at 172, 180. As the Second Circuit explained, the "bargain at issue" was the victim's "ability to contract in the first instance" based on potentially valuable economic information that would have resulted from legitimate bidding process. *Id.* at 172. Here too, the indictment alleges that defendants and their co-conspirators deprived the betting companies of information that would affect their economic decision-making, *see Percoco*, 13 F.4th at 170, whether in the form of accepting wagers or paying out successful wagers. While that may have been enough to support a wire fraud charge under the line of cases leading up to and including *Percoco*, it is not under *Ciminelli*.

**Charging the alleged scheme as federal wire fraud flouts the Supreme Court's repeated warnings against overuse of the federal fraud statutes.**

The Supreme Court has repeatedly warned against expansive applications of the federal fraud statutes. In *Ciminelli*, for example, the Court reminded courts not to "read the mail [and

wire] fraud statute[s] to place under federal superintendence a vast array of conduct traditionally policed by the States." *Ciminelli*, 598 U.S. at 316 (quoting *Cleveland*, 531 U.S. at 27) (brackets in original). Prior to that, in *Cleveland*, the Court warned that expansive interpretations of the federal fraud statutes would "subject to federal mail [or wire] fraud prosecution a wide range of conduct traditionally regulated by state and local authorities." *Cleveland*, 531 U.S. at 24–25.

Such is the case here. The Government has taken an alleged violation of state regulated sportsbooks' rules and transformed it into a federal wire fraud conspiracy, upsetting the "coherent federal policy" regarding sports wagering. *Murphy v. Nat'l Collegiate Athl. Ass'n*, 584 U.S. 453, 484 (2018). Under that policy, the federal government "respect[s] the policy choices of the people of each State on the controversial issue of gambling." *Id.*

In fact, state gaming regulations specifically address the conduct of Mr. Vasquez's codefendants and alleged co-conspirators. The New York Gaming Commission has expansive regulation of brick-and-mortar and mobile sports wagering. The Gaming Commission defines the term "prohibited sports bettor" to include, among others, "any individual placing a sports wager as an agent or proxy" and "any person with access to material, non-public confidential information about a sports event that is the subject of such wagering." 9 N.Y.C.R.R. § 5329.1(k)(1), (4) (defining terms applicable to brick-and-mortar sports wagering); *see also* 9 N.Y.C.R.R. § 5330.1(b)(11)(i), (iv) (applying same definitions to mobile sports wagering). The regulations further state that sports wagering licensees "shall not knowingly accept any sports wager from any prohibited sports bettor," and that any such wager "shall be deemed void." 9 N.Y.C.R.R. § 5329.19; 9 N.Y.C.R.R. § 5330.19. In other words, under the federal policy the Supreme Court described in *Murphy*, New York has crafted a comprehensive regulatory scheme aimed at maintaining the integrity of licensed sports wagering.

Not only does state law set the ground rules for sports wagering, it also guides enforcement. State regulators monitor sports wagering activities and conduct investigations into suspected violations. *See e.g.*, N.Y. Racing, Pari-Mutuel Wagering & Breeding Law ("PML") § 104(4), (6), (9). And if a sportsbook or bettor has violated the rules, regulators can impose civil penalties, and, if necessary, refer suspected criminal activity to state law enforcement for investigation. *See e.g.*, N.Y. PML § 1367(12)(a). Thus, state regulators and law enforcement agencies can, and do, police the conduct the indictment alleges.8 The states' comprehensive regulatory and enforcement regimes reflect that the policy that states are "free to act on [their] own" in regulating sports wagering. *Murphy*, 584 U.S. at 486.

Here, in contravention of *Ciminelli*, the Government flouts this carefully crafted state-federal balance, seeking to make a federal felony out of sports-wagering conduct "traditionally policed by the States." *Ciminelli*, 598 U.S. at 316 (quoting *Cleveland*, 531 U.S. at 27); *see also Cleveland*, 531 U.S. at 25 ("'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes."). The Government takes it upon itself not to punish a deprivation of property, but to enforce its "view of integrity" in sports wagering. *United States v. Chastain*, 145 F.4th 282, 296 (2d Cir. 2025) (quoting *Ciminelli*, 598 U.S. at 312). But as the Supreme Court and Second Circuit have recognized, that is not a valid basis for a prosecution. *Cf. Kelly v. United States*, 590 U.S. 391, 399 (2020) (recognizing, in honest-services context, "that federal fraud law leaves much public corruption to the States . . . to rectify"); *Chastain*, 145 F.4th at 296 (federal wire fraud statute cannot be read to criminalize conduct that "merely depart[s] from traditional notions of fundamental honesty and fair play").

The indictment alleges a scheme that could only be wire fraud under the no-longer-valid right-to-control theory and seeks to impose federal criminal liability for allegedly deceptive conduct traditionally regulated by the states. The wire fraud conspiracy count must therefore be dismissed.

## CONCLUSION

The Superseding Indictment is premised upon the right-to-control theory of wire fraud the Supreme Court expressly rejected in *Ciminelli*. While that, alone, is enough reason to dismiss the Indictment, it isn't the only reason. Charging the alleged wagering scheme as a federal wire fraud conspiracy runs counter to the Supreme Court's repeated warnings against using the federal fraud statutes to federalize state matters and criminalize civil matters. Contrary to the theory underlying the Superseding Indictment here, the federal wire fraud statute does not vest the government with the general power to enforce its view of integrity in sports wagering. Accordingly, count one should be dismissed for failure to state a cognizable offense.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that certify that on May 22, 2026, I served Defendant Robinson Vasquez Germosen's Notice of Motion to Dismiss Count 1 of the Indictment and Memorandum in Support via email to the parties listed on the Notice of Motion. I further certify that on this 22nd day of May, 2026, I served all counsel of record via the Court's electronic filing system.

s/ Todd Andrew Spodek

_____

TODD ANDREW SPODEK, ESQ.
NY Reg. #4489399
Spodek Law Group, P.C.
233 Broadway, Rm. 710
New York, New York 10279-0700
Telephone: (212) 300-5196
Email: ts@spodeklawgroup.com
Attorney for Defendant
ROBINSON VASQUEZ GERMOSEN

20