RCH:EWS/SMS/SME
F. #2025R00435

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

Docket No. 25-CR-346 (S-1) (KAM)

EMMANUEL CLASE DE LA CRUZ,
ROBINSON VASQUEZ GERMOSEN and
LUIS LEANDRO ORTIZ RIBERA

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# THE GOVERNMENT'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Eric Silverberg
Sean M. Sherman
Sarah M. Evans
Assistant U.S. Attorneys
(Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 2

I. Overview of the Criminal Scheme ..... 2

II. The Investigation and the July Warrants ..... 5

III. The Indictment, the November Ortiz Search Warrant, the Vasquez Search Warrant, and the Superseding Indictment ..... 11

ARGUMENT ..... 17

I. Applicable Law ..... 17

II. There Is No Basis to Suppress Evidence from Clase's and Ortiz's Devices Seized Pursuant to the July Warrants or for a *Franks* Hearing ..... 21

A. The Undisputed Facts in the July Affidavits Establish Probable Cause ..... 22

1. There Was Probable Cause that Ortiz and Clase Had Engaged in the Scheme ..... 22

2. There Was Probable Cause to Search Ortiz and Clase's Electronic Devices for Evidence of the Scheme ..... 25

B. The Ortiz Bettors' Gambling History Supported Probable Cause to Issue the July Warrants and Contained No Material Misstatements or Omissions ..... 27

1. The July Affidavits Included Statistical Analysis of the Historical Data ..... 27

2. The July Affidavits Did Not Misrepresent the Historical Gambling Data ..... 30

C. The Description of Ortiz's Loan from Loan Company-1 Was Accurate ..... 42

III. There is No Basis to Suppress Ortiz's Device Seized Pursuant to the November Warrant ..... 43

A. Ortiz's Phone was Lawfully Seized Incident to His Arrest for the Indictment Offenses ..... 44

B. The Five-Day Delay Before Obtaining the November Warrant Was Reasonable ..... 45

C. The November Warrant Was Supported by Probable Cause for Both the Indictment Offenses and the Obstruction Offenses ..... 48

D. The November Affidavit Did Not Knowingly or Recklessly Omit Material Information from the November Affidavit Requiring a *Franks* Hearing ..... 51

1. The November Affidavit Did Not Omit Material Information Related to Ortiz's Receipt of Kickback Money ..... 51

2. The November Affidavit Did Not Omit Any Material Information Related to the Bettors' False Exculpatory Statements ........ 53

IV. The Vasquez Warrant Was Supported by Probable Cause ........ 57

V. Law Enforcement Agents Relied on the Warrants in Good Faith ........ 57

A. Applicable Law ........ 57

B. Discussion ........ 59

CONCLUSION ........ 60

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the motions to suppress evidence filed by the defendants Emmanuel Clase de la Cruz ("Clase Mot."), ECF No. 145, Luis Leandro Ortiz Ribera ("Ortiz Mot."), ECF No. 143, and Robinson Vasquez Germosen ("Vasquez Mot."), ECF No. 149. Defendants Clase and Ortiz are charged in a five-count superseding indictment with (1) conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349; (2) conspiracy to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1349; (3) conspiracy to influence sporting contests by bribery, in violation of Title 18, United States Code, Section 224; and (4) money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h). See ECF No. 80 ("Superseding Indictment"). Vasquez and another individual whose identity is under seal ("Defendant-4") are also charged with conspiracy to commit wire fraud. See id. The superseding indictment also charges Vasquez with making materially false statements to law enforcement agents, in violation of Title 18, United States Code, Section 1001(a)(2). The charges arise out of the defendants' scheme to rig pitches in Major League Baseball games for money.

The defendants move to suppress evidence recovered from their respective electronic devices pursuant to search warrants (collectively, the "Subject Warrants"). For the reasons that follow, the defendants' arguments should be rejected, and their motions should be denied.

# STATEMENT OF FACTS

## I. Overview of the Criminal Scheme

As the government will prove at trial, the defendants engaged in a scheme to rig pitches in Major League Baseball ("MLB") games.[1] Clase and Ortiz were MLB pitchers and teammates on the Cleveland Guardians. See ECF No. 80 ("Superseding Indictment) ¶¶ 3–4. Clase was a relief pitcher and Ortiz was a starting pitcher; they were both from the Dominican Republic. Id. Defendant-4 was also a citizen of the Dominican Republic and was lifelong friends with Clase, including residing with Clase in Ohio during the pendency of the scheme. Id. ¶ 6. Vasquez, who was also a citizen of the Dominican Republic, was closely associated with Clase. Id. ¶ 5.

From May 2023 through June 2025, Clase agreed to share advance information about pitches he would throw in upcoming MLB games with Vasquez, Defendant-4, and an individual referred to as Bettor-1 [redacted] so that they and other individuals (collectively, the "Bettors") could use the advance, inside information from Clase to place fraudulent wagers on online betting platforms (the "Betting Platforms") including Betting Platform-1 [redacted],[2]

---

[1] These facts are drawn from the Superseding Indictment in this case (ECF No. 80); the Subject Warrants and supporting affidavits, which were attached under seal to the defendant's motions (and for Vasquez, is being filed under seal in connection with this opposition brief); materials produced to the defendants as discovery in this case; and facts that the government proffers in connection with the instant motion and anticipates that it will establish at trial. The government's evidence at trial will consist of, among other things, (i) witness testimony; (ii) text and audio messages from the defendants and their co-conspirators; (iii) various documents and other records, including gambling records, geolocation records, financial records, photographs, and videos.

[2] The defendants filed their motions under seal in the first instance because they referenced the search warrant affidavits, which have been designated Sensitive because they contain personally identifiable information for victims and third parties other than the defendants. For the same reason, the government has also filed this memorandum under seal in the first instance. The government will confer with the defendants regarding appropriate redactions in order to file all of the memoranda relating to the motions to suppress publicly. Because the government anticipates filing this memorandum publicly with redactions, it has included and used

Betting Platform-2 [redacted] and Betting Platform-3 [redacted] Id. ¶¶ 7, 18. Typically, Clase agreed to throw slower "slider" pitches that were "balls" (meaning outside of the strike zone) on the first pitches of at-bats when Clase was brought into the game as a relief pitcher, and the Bettors wagered accordingly. Id. ¶ 23. As part of the scheme, Vasquez and Defendant-4 acted as intermediaries between Clase and the other Bettors. Id. ¶ 18. Vasquez and Defendant-4 provided advance information from Clase to the Bettors about the pitches that Clase would throw in exchange for proceeds from the Bettors' fraudulent wagers on the pitches thrown by Clase. Id. ¶ 20. In addition, Vasquez placed bets on fixed pitches through an account he opened in the name of another individual, [redacted] referred to in the Superseding Indictment as Individual-2. Id. ¶ 12.

The defendants and their co-conspirators often communicated in text and audio messages sent via cellular telephones on WhatsApp about the fixed pitches, at times using code words including but not limited to "rooster" and "chicken." Id. ¶ 20. As illustrated in the Superseding Indictment, on numerous instances between 2023 and 2025, Clase agreed to throw fixed pitches to the benefit of the Bettors, and Clase and his co-conspirators used cellular telephones to facilitate the scheme. See id. ¶¶ 23–47.

Bets placed on an individual player's performance during a game, rather than on the final outcome of the game, were a type of bet referred to as a "proposition bet" or "prop bet." Id. ¶ 16. For example, the Betting Platforms offered "Pitch Type" wagers that a specific pitch thrown by Clase or Ortiz would be either a ball or a batter hit by pitch, as opposed to a strike ("Ball/HBP"). Id. In addition, the Betting Platforms also offered users the ability to place wagers

anonymized names for all relevant third parties throughout this brief. The proposed redactions are highlighted in yellow throughout.

on the speed of a given pitch ("Pitch Speed"), such as whether the pitch would be above 94.95 miles per hour ("mph"). Id. ¶ 17. Sportsbooks like the Betting Platforms also offered "parlay bets," which were wagers comprised of two or more individual bets. Id. For a bettor to win a parlay bet, each wager, or "leg," within the parlay bet needed to win; if either leg lost, the entire parlay bet would lose. Id. Because parlay bets required the bettor to win multiple bets, the payouts for winning parlay bets generally were higher than the payouts for winning single bets. Id.

In or about June 2025, Ortiz joined the scheme and agreed to throw pitches in exchange for money. Id. ¶¶ 21, 48. First, Ortiz agreed to throw a ball for his first pitch in the second inning ("Subject Pitch-1") in a game between the Cleveland Guardians and the Seattle Mariners on June 15, 2025 (the "June 15 Game"). Id. ¶¶ 49–55. As detailed below, before the June 15 Game had begun, and thus before they knew which batter would hit first in the second inning, Bettor-1 and Bettor-2—two of the Bettors who had been engaged in the ongoing scheme with Clase—began wagering thousands of dollars that Subject Pitch-1 would be a Ball/HBP. Id. ¶ 51. Bettor-2 placed wagers on Subject Pitch-1 both through his own account as well as an account in the name of [redacted], who is referred to in the Superseding Indictment as "Individual-1." Id. ¶¶ 11, 51.

Between June 16, 2025, and June 19, 2025, Clase facilitated the transfer of Ortiz's kickback payment of approximately $5,000 from Bettor-1 to "Clase Associate-1," [redacted] and then to "Ortiz Associate-1," [redacted], for Ortiz's benefit. Id. ¶¶ 52–54. On June 19, 2025, Clase sent a photograph of a wire transfer receipt documenting a transfer of 90,000 pesos from Clase Associate-1 (to whom Bettor-1 had sent the bribe payments) to Ortiz Associate-1. Id. ¶ 54. Clase then told Ortiz in a voice memo: "They're going to ask him

what is that payment for over there. Tell him that this is payment for a horse. Payment for a horse. You got that?" Ortiz responded, "Okay, perfect." Id.

A few days later, Ortiz agreed to throw another pitch for money. Id. ¶ 55. This time, Ortiz agreed to throw a ball for his first pitch in the third inning ("Subject Pitch-2") during a game held on June 27, 2025, between the Cleveland Guardians and the St. Louis Cardinals (the "June 27 Game"). Id. Before the June 27 Game began—and thus before anyone knew which batter would hit first in the third inning—Bettor-1, Bettor-2, Bettor-1's brother [redacted] "Bettor-3"), and Bettor-2's daughter ([redacted], "Bettor-4") began wagering thousands of dollars that Ortiz's first pitch in the bottom of the third inning would be a ball. Id.

Overall, the Bettors won at least $450,000 from the Betting Platforms on pitches thrown by Clase and Ortiz. Id. ¶ 22. As a result of the suspicious wagering on Ortiz's two pitches, shortly after the June 27 Game, the pitch-rigging scheme was detected. By July 3, 2025, Ortiz was placed on leave. Clase was placed on leave weeks later.

## II. The Investigation and the July Warrants

On or about July 1, 2025, the government began investigating the pitch-rigging scheme. The investigation was initially focused on suspicious wagering on Ortiz's two Subject Pitches by five of the Bettors—Bettor-1 [redacted] Bettor-2 [redacted] Individual-1 [redacted], now known to be a nominal account holder for Bettor-2, [redacted] Bettor-3 ([redacted], now known to be Bettor-1's brother), and Bettor-4 ([redacted] now known to be Bettor-2's daughter) (collectively, the "Ortiz Bettors"). Over the course of the next nine days, the investigation expanded, and the government developed probable cause that Ortiz, Clase and the Ortiz Bettors had engaged in the pitch-rigging scheme. Probable cause was based on records obtained during that period, including an initial set of gambling and geolocation records obtained from Betting Platform-1 [redacted] and Betting Platform-2 [redacted], limited

financial records, MLB records of complimentary tickets obtained by Ortiz and Clase, law enforcement records, and open-source information. That information showed the following:[3]

A. <u>Relationships among the Subjects</u>

The investigation showed that Bettor-1 and Clase were closely associated with one another, and that the Ortiz Bettors were also associated with one another, which indicated that their wagers were not coincidental, but were the product of collusion. With respect to the relationship between Bettor-1 and Clase, records from MLB showed that Clase requested and obtained complimentary tickets to baseball games for Bettor-1 on approximately 26 separate occasions between August 2024 and June 2025. Ortiz Mot. Ex. A ("Ortiz July Aff.") ¶ 20; Clase Mot. Ex. 1 ("Clase Aff.") ¶ 20. In each of the 26 instances, Clase indicated that his relationship with Bettor-1 was "family." Ortiz July Aff. ¶ 20; Clase Aff. ¶ 20. Most relevant, Clase obtained tickets for Bettor-1 to the June 27 Game, in which Bettor-1 and several other Ortiz Bettors engaged in the suspicious wagers on Subject Pitch-2. Ortiz July Aff. ¶ 20; Clase Aff. ¶ 20. In addition, geolocation data obtained from Betting Platform-2 indicated that Bettor-1 spent a significant amount of time at Clase's residence in Ohio (the "Clase Residence"). Ortiz July Aff. ¶ 21; Clase Aff. ¶ 21. Specifically, geolocation data for Bettor-1's Betting Platform-2 account indicated that the account was accessed from the Clase Residence approximately 103 times on 30 unique dates between September 15, 2024, and June 29, 2025. Ortiz July Aff. ¶ 21; Clase Aff. ¶ 21. Historical cell-site location data also showed that from May 1, 2025, through July 7, 2025, a phone associated

[3] This section summarizes the information that was understood at the time and was subsequently included in the July Warrants. Over the course of the investigation, the government has obtained significant additional information, including additional and updated data from the Betting Platforms, which the government expects it will introduce at trial. Consistent with the affidavits in support of the July Warrants, the government will argue at trial that the gambling data supports the existence of the criminal scheme alleged in the Superseding Indictment.

with Bettor-1 was within the vicinity of the Clase Residence on more than a dozen occasions.[4] Ortiz July Aff. ¶ 20; Clase Aff. ¶ 20.

The investigation also showed that the Ortiz Bettors were associated with one another. Ortiz July Aff. ¶ 22; Clase Aff. ¶ 22. Records showed that Bettor-1 and Bettor-2 were associates. In particular, between May 13, 2025, and June 9, 2025, Bettor-2 made five peer-to-peer financial transactions to Bettor-1, totaling approximately $4,500. Ortiz July Aff. ¶ 23; Clase Aff. ¶ 23. Law enforcement databases indicated that two addresses in the Bronx were associated with both Bettor-1 and Bettor-3, indicating that the two may have resided together (and as noted above, the government later learned that they are brothers). Ortiz July Aff. ¶ 22; Clase Aff. ¶ 22. Similarly, records indicated that Bettor-2 and Bettor-4 were related to one another, and law enforcement databases indicated that an address in the Bronx was associated with both Bettor-2 and Bettor-4, (as noted above, the government later confirmed that Bettor-2 was Bettor-4's father). Ortiz July Aff. ¶ 22; Clase Aff. ¶ 22.

B. Suspicious Wagering Activity on Clase's Pitches

Betting Platform-2 gambling and geolocation records for Bettor-1 also supported probable cause to believe that Bettor-1 had placed wagers on Clase's pitches based on advance inside information. Ortiz July Aff. ¶ 24; Clase Aff. ¶ 24. In particular, Betting Platform-2 records showed that between May 2023 and July 2025, Bettor-1 made over 200 wagers on Clase's mid-game pitching performance, including approximately 37 Ball/HBP wagers and approximately 158 Pitch Speed bets. Ortiz July Aff. ¶¶ 24–25; Clase Aff. ¶¶ 24–25. Betting Platform-2 records showed that of the 158 Pitch Speed bets, Bettor-1 won twice as often: winning approximately 98

[4] The historical cell-site location data was obtained pursuant to a search warrant for such data from phone numbers associated with each of the Ortiz Bettors authorized by the Honorable Lara K. Eshkenazi on July 7, 2025.

wagers ($110,386) and losing 53 wagers ($15,314.51), for net profits of approximately $95,000. Ortiz July Aff. ¶ 25; Clase Aff. ¶ 25. When broken out, Bettor-1's larger wagers in this category had a significantly higher win rate. Ortiz July Aff. ¶ 25; Clase Aff. ¶ 25. For example, of the 17 wagers between $1,000 and $5,000, Bettor-1 won 15, lost one, and one was cancelled, for a win rate of approximately 88%. Ortiz July Aff. ¶ 25; Clase Aff. ¶ 25. And of the 18 wagers between $700 and $999, Bettor-1 won 15, lost two, and one was cancelled, for a win rate of approximately 83%. Ortiz July Aff. ¶ 25; Clase Aff. ¶ 25. Similarly, of the 37 Ball/HBP wagers, Bettor-1 won approximately 70% of the time, winning 26 wagers (a gain of $32,295) losing only 10 wagers (a loss of $3,768.62), and cancelling one wager, for net profits of approximately $28,526. Ortiz July Aff. ¶ 25; Clase Aff. ¶ 25.

A review of Betting Platform-2 geolocation information combined with Bettor-1's wagers provided additional reason to believe that several of Bettor-1's wagers were placed in coordination with Clase. For example, on at least three occasions, Bettor-1 accessed Betting Platform-2 from Clase's Residence before and/or after MLB games in which Bettor-1 won thousands of dollars wagering on Clase's pitches.[5] Ortiz July Aff. ¶¶ 27–29; Clase Aff. ¶¶ 27–29. For all three occasions, Clase obtained tickets for Bettor-1 to attend the MLB games. Ortiz July Aff. ¶¶ 27–29; Clase Aff. ¶¶ 27–29.

C. Ortiz's Debt and Suspicious Wagering Activity on Ortiz's Subject Pitches

According to MLB, Ortiz was in debt to [redacted] ("Loan Company-1"), a firm that advances money to professional athletes in exchange for payments on future earnings.

[5] While not challenged by the defendants, the affidavits incorrectly state the MLB game on May 13, 2025, occurred on May 14, 2025. The pitches in two of those MLB games, on April 26, 2025, and May 13, 2025, were subsequently included as fixed pitches in the Superseding Indictment. See Superseding Indictment ¶¶ 40, 43.

See Ortiz July Aff. ¶ 47. MLB indicated that Ortiz's paychecks from the Cleveland Guardians were paid directly to Loan Company-1. Id.

Betting Platform-1 and Betting Platform-2 records for the Ortiz Bettors supported probable cause to believe that their wagers placed on Subject Pitch-1 and Subject Pitch-2 were the result of advance inside information.

1. The June 15 Game – Subject Pitch-1

With respect to Subject Pitch-1, according to MLB, geolocation information from Betting Platform-1 indicated that the evening before the June 15 Game, Bettor-1 and Individual-1 were in the same location. Ortiz July Aff. ¶ 31; Clase Aff. ¶ 31. In addition, phone records indicated that in the early morning of June 15, 2025, Bettor-1 called Bettor-2, and the call lasted for approximately 24 seconds. Ortiz July Aff. ¶ 33; Clase Aff. ¶ 33. Thus, in addition to the information described above, there was reason to believe that Bettor-1, Bettor-2, and Individual-1 were associated with one another, and that their subsequent wagers on Subject Pitch-1—which were suspicious in and of themselves—were the result of shared information, not coincidence.

The June 15 Game was scheduled to start at approximately 4:10 p.m. Ortiz July Aff. ¶ 32; Clase Aff. ¶ 32. Records from Betting Platform-1 and Betting Platform-2 showed that Bettor-1, Bettor-2, and Individual-1 all placed winning wagers on Subject Pitch-1. Ortiz July Aff. ¶ 33; Clase Aff. ¶ 33. Specifically, the records showed that within approximately one hour of one-another, and starting before the June 15 Game began, Bettor-1 and Individual-1 (on Betting Platform-1) and Bettor-2 (on Betting Platform-2) each placed bets totaling approximately $13,438 in which they wagered that Subject Pitch-1 would be a Ball/HBP. Ortiz July Aff. ¶ 33; Clase Aff. ¶ 33. Ortiz threw a ball, resulting in the Bettors winning approximately $25,000. Ortiz July Aff. ¶ 31; Clase Aff. ¶ 31. The details of those wagers, which were outside of the Bettors' ordinary

gambling behavior, are described in detail below. See infra Part II(B); Ortiz July Aff. ¶¶ 35–37; Clase Aff. ¶¶ 35–37.

2. The June 27 Game – Subject Pitch-2

With respect to Subject Pitch-2, on June 27, 2025, within approximately one hour of each other, and starting before the June 27 Game began, Bettor-1, Bettor-2, Bettor-3, and Bettor-4 each placed bets totaling approximately $7,950 on Betting Platform-1, in which they gambled that Subject Pitch-2 would be a Ball/HBP. Ortiz July Aff. ¶ 39; Clase Aff. ¶ 39. In addition, Bettor-2 and Bettor-4 placed bets totaling approximately $10,400 on both Betting Platform-1 and Betting Platform-2 that Subject Pitch-2 would be a Ball/HBP. Ortiz July Aff. ¶ 40; Clase Aff. ¶ 40. Ortiz threw a ball, and as a result, these Bettors won approximately $37,059.[6] Ortiz July Aff. ¶ 41; Clase Aff. ¶ 41. The details of those wagers, which were outside of the Bettors' ordinary gambling behavior, are described in detail below. See Ortiz July Aff. ¶¶ 43–44; Clase Aff. ¶¶ 43–44; infra Part II(B).

Ortiz's debt to Loan Company-1, the pre-existing associations among the subjects (between teammates Ortiz and Clase, between Clase and Bettor-1, and among Bettor-1 and the other Ortiz Bettors), and the close temporal proximity of their wagers to one another, strongly indicated that Ortiz, Clase, and the Ortiz Bettors likely engaged in a scheme to rig pitches, and likely engaged in communications about the scheme on their electronic devices. See Ortiz July Aff. ¶ 50.

---

[6] Bettor-1 and Bettor-4 each made one of their bets on Ortiz contingent upon other proposition bets that did not involve Ortiz, so-called "parlays." Because the other portions of their parlay bets did not succeed, Bettor-1 and Bettor-4 did not win some of the bets they placed involving Ortiz, even though the portion of the bets involving Ortiz did succeed.

D. The July Warrants

Based on the information the investigation had learned to date—which is generally described in Part I(C) above—between July 7, 2025, and July 10, 2025, United States Magistrate Judges in in the Eastern District of New York, Southern District of New York, District of Connecticut, District of Massachusetts, Northern District of Illinois, and Northern District of Ohio authorized seven warrants to search Clase (the "Clase Warrant"), Ortiz (the "Ortiz July Warrant"), and all of the Ortiz Bettors (Bettor-1, Bettor-2, Individual-1, Bettor-3, and Bettor-4), and seize electronic devices in their possession, custody, or control.

As relevant to the instant motions, the Clase Warrant and the Ortiz July Warrant (collectively the "July Warrants") authorized law enforcement agents to search Clase and Ortiz, and to seize and search electronic devices in their possession, custody, and control for evidence of violations of Title 18, United States Code, Sections 224 (bribery in sporting contests), 371 (conspiracy), 1343 (wire fraud), 1346 (honest-services wire fraud), 1349 (wire fraud conspiracy), 1956 (money laundering and money laundering conspiracy), 1957 (money laundering), 1952 (use of interstate facility to promote unlawful activity), and 1084 (transmission of wagering information) (collectively, the "July Offenses").

On July 11, 2025, the government simultaneously executed the warrants and seized electronic devices from Clase, Ortiz, and several of the Ortiz Bettors, thus alerting them to the government's ongoing investigation.

III. The Indictment, the November Ortiz Search Warrant, the Vasquez Search Warrant, and the Superseding Indictment

As a result of the July Warrants, the government uncovered hundreds of text and audio messages between and among the co-conspirators that corroborated the initial probable cause determinations that Clase, Ortiz, Vasquez, Bettor-1, and the other Bettors had engaged in

the pitch-rigging scheme, some of which, but not all, are described in the Indictment and the Superseding Indictment. See supra Part I(A). Over the following months, that initial probable cause determination was also corroborated by additional financial records, gambling records, and witness statements, among other evidence.

A. Ortiz's Receipt of a Kickback Payment for Subject Pitch-1

The ongoing investigation revealed, among other things, that Ortiz agreed with Clase that in exchange for $5,000, he would throw a ball for Subject Pitch-1 during the June 15 Game. In the days following the June 15 Game, Ortiz and Clase discussed the transfer of 290,000 Dominican pesos from Clase to Ortiz, which equaled roughly $4,900. See Ortiz Mot. Ex. B ("Nov. Aff.") ¶¶ 11-12 (citing Indictment ¶¶ 34-36). In their messages, Clase and Ortiz specifically discussed the transfer of 90,000 Dominican pesos (out of the 290,000 pesos in kickback money). See id.

The kickback money was transferred from Bettor-1 to Clase Associate-1, [redacted]—whom Clase had also previously used as an intermediary to receive a kickback payment from Bettor-1—and then to Ortiz Associate-1, [redacted]. See id. After 90,000 pesos were transferred from Clase Associate-1 to Ortiz Associate-1, Clase sent Ortiz an audio message directing Ortiz to tell Ortiz Associate-1 that the 90,000 was payment for a horse. See Nov. Aff. ¶¶ 11-12 (citing Indictment ¶¶ 34-36). Specifically, Clase told Ortiz, "They're going to ask him what is that payment for over there. Tell him that this is payment for a horse. Payment for a horse. You got that?" Ortiz responded, "Okay, perfect." See Indictment ¶ 36.

B. The Pre-Charge Presentations and Obstruction of Justice

In or around September 2025, counsel for Ortiz and counsel for Clase separately met with the government. During those meetings, counsel for Ortiz and Clase indicated that the

payment of 90,000 pesos described above was not a bribe payment. Rather, they told the government that the 90,000 pesos was Clase's repayment of a March 2025 loan from Ortiz to purchase a horse from another individual, [redacted] ("Ortiz Associate-2"). As noted above, and as alleged in the Indictment and Superseding Indictment, Clase told Ortiz to claim that the 90,000 pesos kickback was payment for a horse. See supra at 4–5.

On or about November 4, 2025, law enforcement agents engaged in a voluntary telephone interview with Ortiz Associate-2, who was in the Dominican Republic at the time. Nov. Aff. ¶ 14. Ortiz Associate-2 purported to train and sell horses. Id. Ortiz Associate-2 stated, in sum and substance and in part, that he had been friends with Ortiz for years. Id. Ortiz Associate-2 stated that Ortiz and Clase had each bought horses from Ortiz Associate-2. Id. Ortiz Associate-2 claimed that at some time in the recent past, Ortiz lent Clase 90,000 Dominican pesos to purchase a horse. Id. Ortiz Associate-2 had no records of the transaction. Id. Ortiz Associate-2 also noted that he had spoken with Ortiz and Clase a few days before speaking with law enforcement agents. Id.

C. The Indictment and November Ortiz Search Warrant

On or about November 5, 2025, for their roles in the pitch-rigging scheme, the grand jury returned a four-count sealed indictment charging Clase and Ortiz with wire fraud conspiracy, in violation of 18 U.S.C. § 1349, honest services wire fraud conspiracy, in violation of 18 U.S.C. § 1349, conspiracy to influence sporting contests by bribery, in violation of 18 U.S.C. § 224, and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (collectively, the "Indictment Offenses"). See ECF No. 1 (the "Indictment"). Sealed arrest warrants were also issued that day.

On or about November 9, 2025, Ortiz was arrested pursuant to an arrest warrant. Law enforcement agents seized a cellular telephone in his custody incident to his arrest. On November 14, 2025, the Honorable Joseph A. Marutollo authorized a warrant to search Ortiz's phone (the "November Warrant"). The November Warrant authorized law enforcement agents to seize evidence of the Indictment Offenses, as well as evidence of obstruction-related offenses, specifically, conspiracy, in violation of 18 U.S.C. § 371, making materially false statements, in violation of 18 U.S.C. § 1001, and witness tampering, in violation of 18 U.S.C. § 1512(b) (collectively, the "Obstruction Offenses"). Probable cause for the Indictment Offenses was premised on the grand jury returning the Indictment for those offenses, which was attached and incorporated into the affidavit in support of the November Warrant. See Nov. Aff. ¶ 10 & Ex. 1 (the Indictment). Probable cause for the Obstruction Offenses was premised on Ortiz and/or Clase directing Ortiz Associate-2 to lie to law enforcement about the 90,000 pesos payment from Clase to Ortiz in June 2025 in order to conceal the true purpose of the payment, namely a bribe for Ortiz throwing Subject Pitch-1, and directing their attorneys to make the same false representation to the government during the September pre-charge meetings.

D. Vasquez's Arrest and Search Warrant, and the Superseding Indictment

On December 10, 2025, the Honorable Cheryl L. Pollak authorized a sealed criminal complaint charging Vasquez with conspiracy to commit wire fraud for his role in the pitch-rigging scheme. See Gov't Ex. A (Vasquez Warrant, attaching the Criminal Complaint as Exhibit A). A sealed arrest warrant was also issued that day.

On or about December 17, 2025, Vasquez was arrested pursuant to an arrest warrant. Shortly after his arrest, Vasquez provided consent for the agents to retrieve one of his cellular telephones ("Vasquez Device-1") from a white van, which was unlocked and parked in the driveway

of the residence at which he was arrested. After Vasquez's arraignment, law enforcement agents were given a second cellular telephone ("Vasquez Device-2," and collectively, the "Vasquez Devices") by a female who identified herself as Vasquez's wife with the consent of Vasquez through his counsel after his arrest. Vasquez subsequently signed a form, in the presence of his attorney, authorizing the FBI to search Vasquez Device-2.[7] On January 9, 2026, Vasquez met with the government and stated, among other things, that on one occasion, Vasquez knew Clase told Bettor-1 that he was going to throw a slower ball for a certain pitch, and Bettor-1 then told Vasquez and subsequently sent a picture of Bettor-1's bet. Other than his knowledge of that one occasion, Vasquez denied any knowledge or participation in the pitch-rigging scheme.

On January 22, 2026, United States Magistrate Judge James R. Cho authorized a warrant to search both of the Vasquez Devices (the "Vasquez Warrant"). See Gov't Ex. A. The affidavit in support of the Vasquez Warrant (the "Vasquez Affidavit") attached the criminal complaint against Vasquez, a prior search warrant authorized by a magistrate judge from the Southern District of New York to seize and search Vasquez's devices, and the Indictment. See Gov't Ex. A (Exhibits A, B, and 1). The Vasquez Affidavit also detailed Vasquez's involvement in the pitch-rigging scheme—including Vasquez's use of his phone in furtherance of the scheme, his false statements to attorneys for Clase (denying his involvement in the scheme), and his partial admission to the government that he knew that Clase had provided advance inside information about a single pitch. See Vasquez Aff. ¶¶ 16–36.

Based on that information, as well as the information included in the criminal complaint and the indictment, Magistrate Judge Cho authorized law enforcement agents to search

---

[7] A copy of Vasquez's subsequently executed consent form for Vasquez Device-2 is attached as Exhibit B. Vazques appears to concede that for Vazquez Device-2, his consent provides an alternative basis on which the government's search of the device was lawful.

the Vasquez Devices for evidence of violations of Title 18, United States Code, Sections 224 (bribery in sporting contests), 371 (conspiracy), 1001 (making false statements), 1343 (wire fraud), 1346 (honest-services wire fraud), 1349 (wire fraud conspiracy and honest-services wire fraud conspiracy), 1512(c) (obstruction of justice), 1956 (money laundering and money laundering conspiracy), 1957 (money laundering), 1952 (use of interstate facility to promote unlawful activity), and 1084 (transmission of wagering information) (collectively, the "Vasquez Offenses").

On February 12, 2026, the grand jury returned the Superseding Indictment, which added Vasquez and Defendant-4 to the wire fraud conspiracy count. See Superseding Indictment. The Superseding Indictment also charged Vasquez with making materially false statements to law enforcement agents, in violation of Title 18, United States Code, Section 1001(a)(2), based on his false statement to law enforcement agents that he was only aware of a single fixed pitch. The Superseding Indictment did not contain additional charges against Clase or Ortiz.

II. The Motions to Suppress

On May 22, 2026, Clase and Ortiz both moved to suppress devices seized pursuant to the July Warrants or for hearings pursuant to Franks v. Delaware, 438 U.S. 154 (1978), ECF Nos. 143, 145. In general, both defendants argue that the information in support of the July Warrants did not amount to probable cause either that they had engaged in the pitch-rigging scheme or that there was evidence of the scheme on their electronic devices, and that the affidavits in support of the July Warrants omitted and misrepresented material information. Ortiz also moved to suppress the device that was seized incident to his arrest and searched pursuant to the November Warrant, or for

a Franks hearing. See ECF No. 143. Vasquez moved to suppress the device seized pursuant to the Vasquez Warrant, arguing that there was not probable cause to seize his devices. See ECF No. 149.[8]

## ARGUMENT

### I. Applicable Law

The Fourth Amendment commands that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "[P]robable cause is a flexible, common-sense standard," Texas v. Brown, 460 U.S. 730, 742 (1983), and the Fourth Amendment requires "[o]nly the probability, and not a prima facie showing, of criminal activity" to meet it, Gates, 462 U.S. at 235 (internal quotation marks omitted). In assessing the sufficiency of a warrant application, the training and experience of law enforcement agents bear significantly on the probable cause determination. Id. at 232. Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances and their training and experience may all support a probable-cause finding. Id. at 231–32; see also United States v. Gaskin, 364 F.3d 438, 457 (2d Cir. 2004) ("[C]ourts recognize that experience

[8] Vasquez's motion challenges the Vasquez Warrant but also refers only to one of the two cellular devices, presumptively Vasquez Device-1, which Vasquez did not consent to be searched. Nevertheless, because the defendant challenges the Vasquez Warrant writ large and does not clarify which of the two phones he is seeking to suppress, the government's opposition is with respect to the Warrant, and the government seeks an order denying a motion to suppress evidence from both of the Vasquez Devices. However, as noted above, because Vasquez consented to the search of Vasquez Device-2, that is an alternative basis to uphold the search of that device.

and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not.").

When evaluating a search warrant, the district court's evaluation "should not take the form of de novo review." Gates, 462 U.S. at 236. As the Supreme Court has held, courts reviewing a magistrate judge's decision to issue a specific warrant should apply a "deferential standard of review," which "further[s] the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." Massachusetts v. Upton, 466 U.S. 727, 733 (1984) (per curiam); see also United States v. Jakobetz, 955 F.2d 786, 803 (2d Cir. 1992) ("Determinations by magistrates and judges who issue warrants are accorded great deference and any doubts should be resolved in favor of upholding the warrants." (internal quotation marks and citations omitted)). Resolving doubts in favor of the warrant encourages the use of warrants and also recognizes that "once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case." Gates, 462 U.S. at 237 n.10. Thus, a court must "resolve any doubt about the existence of probable cause in favor of upholding the warrant," United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998), and must accord "considerable deference to the probable cause determination of the issuing magistrate," Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007). Under this deferential standard, an individual "who argues that a warrant was issued on less than probable cause faces a heavy burden." Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991). Accordingly, "[a] search or seizure executed in accordance with a warrant is presumptively valid." United States v. An, 733 F. Supp. 3d 77, 99 (E.D.N.Y. 2024) (citing United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003)).

"[I]n certain limited circumstances, a criminal defendant may challenge a warrant by attacking the veracity of the warrant's underlying affidavit pursuant to Franks v. Delaware, 438

U.S. 154 (1978)." United States v. Clanton, No. 23-CR-328 (KAM), 2024 WL 4854524, at *5 (E.D.N.Y. Nov. 21, 2024). "To be entitled to a Franks hearing, a defendant must make a 'substantial preliminary showing' that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." Id. (quoting Salameh, 152 F.3d at 113). In doing so, the defendant faces a "heavy burden." United States v. Sandalo, 70 F.4th 77, 86 & n.7 (2d Cir. 2023); United States v. Figueroa, 750 F.2d 232, 237 (2d Cir. 1984).

"The first prong of the Franks test requires a showing of deliberate falsehood or reckless disregard for the truth." Clanton, 2024 WL 4854524, at *5 (citing Salameh, 152 F.3d at 113). "Notably, '[e]very statement in a warrant affidavit does not have to be true.'" Id. (quoting United States v. Trzaska, 111 F.3d 1019, 1027 (2d Cir. 1997) (citing Franks, 438 U.S. at 165)). "Instead, Franks requires that the statements in a warrant affidavit 'be believed or appropriately accepted by the affiant as true.'" Id. (quoting United States v. Campino, 890 F.2d 588, 592 (2d Cir. 1989)). "A defendant challenging misstatements or omissions in connection with a warrant affidavit under Franks must demonstrate that the allegedly false statements were 'made intentionally, knowingly, or with reckless disregard for the truth.'" Id. (quoting United States v. Ferguson, 758 F.2d 843, 848 (2d Cir. 1985) (citing Franks, 438 U.S. at 155–56)). "Allegations of intentionally or knowingly false statements must be 'accompanied by an offer of proof.'" Id. (quoting Franks, 438 U.S. at 171 ("Allegations of negligence or innocent mistake are insufficient.")). "A defendant can prove reckless disregard for the truth where 'the affiant in fact entertained serious doubts as to the truth of his allegations.'" Id. (quoting United States v. Rajaratnam, 719 F.3d 139, 154 (2d Cir. 2013)).

"Omissions, though, 'are not subject to the same high level of scrutiny as misstatements.'" Id. (quoting United States v. Rivera, 750 F. Supp. 614, 617 (S.D.N.Y. 1990)). "Although reckless disregard 'can sometimes be inferred from the omission of critical information, . . . such an inference is not to be automatically drawn simply because a reasonable person would have included the omitted information.'" Id. (quoting Rajaratnam, 719 F.3d at 154). "This is particularly true where 'the omission was the result of a considered and reasonable judgment that the information was not necessary to the . . . application.'" Id. (quoting Rajaratnam, 710 F.3d at 155). As to omissions, simply showing that an affiant acted with "intent to exclude information is insufficient" to establish that an omission was made with the requisite intent. Awadallah, 349 F.3d at 67. "Rather, Franks protects against omissions that [were] 'designed to mislead, or that [were] made in reckless disregard of whether they would mislead, the magistrate.'" Id. at 68 (quoting United States v. Colkley, 899 F.2d 297, 300–01 (4th Cir.1990)).

"[I]f a defendant can make a sufficient showing that false statements were deliberately or recklessly included in a warrant affidavit, a court should" then move on to the second prong of the Franks test, which takes the form of a materiality analysis. Trzaska, 111 F.3d at 1027 (citing Franks, 438 U.S. at 171–72). This inquiry requires that the court put aside the alleged misstatements or omissions and determine whether "the remaining portions of the affidavit would support probable cause to issue the warrant." United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000) (citation omitted). A Franks hearing is only required if the reviewing court determines that, taking only the untainted portions of the application, the affidavit includes an insufficient basis for a finding of probable cause. See Rajaratnam, 719 F.3d at 146. Otherwise, "suppression is not required." Id.

## II. There Is No Basis to Suppress Evidence from Clase's and Ortiz's Devices Seized Pursuant to the July Warrants or for a *Franks* Hearing[9]

The July Warrants were supported by probable cause that Clase and Ortiz had engaged in the pitch-rigging scheme and that evidence of the scheme would be found on their phones. The defendants' main argument to the contrary—that the government presented a misleading snapshot of gambling data that overstated the unusual nature of the Bettors' wagers—is not only unsupported by any particularized counter-examples, it is wrong. To the extent the defendants dispute whether the gambling data alone demonstrates their clients' guilt beyond a reasonable doubt—which is not the government's primary evidence, but for argument's sake—that is for the jury at trial; for the purposes of the July Warrants, the undisputed facts established probable cause. Furthermore, the defendants do not dispute the other evidence supporting probable cause, which was presented in conjunction with the gambling data. And because there was evidence that the Ortiz Bettors used cellular telephones (for calls, wagering, and transferring

[9] Ortiz submitted a lengthy memorandum of law in support of his motion to suppress or for a Franks hearing. See ECF No. 143. Clase submitted a short brief that made substantially the same arguments as Ortiz and incorporated Ortiz's arguments by reference. See ECF No. 145, at 5. Accordingly, the government responds to their joint arguments in a consolidated fashion below and subsequently addresses Ortiz's individualized arguments. The only unique argument Clase raises is that his photograph in the affidavit in support of the Clase Warrant was incorrectly attributed to the Ohio Department of Motor Vehicles—which the government interprets to be an argument that the application was not sufficiently particularized (because it has no identifiable bearing on probable cause). See id. at 2. The government agrees that the source of the Clase photograph was incorrectly attributed to the Ohio DMV, an error that was inadvertently introduced in the revision process for the search warrant affidavit. By contrast, the affidavit in support of the Ortiz July Warrant correctly lists his photograph as coming from his "MLB.com player profile." See Ortiz July Aff. ¶ 48. Regardless, Clase does not dispute that he was the individual in the photograph, or that the affidavit and warrant accurately listed his name, height, and date of birth. See Clase Aff. at 19–20. Thus, because the warrant was "sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers," the misattribution of the photograph's provenance is not a basis to suppress the evidence or for a Franks hearing. United States v. Hernandez, No. 09-CR-625 (HB), 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010) (citations omitted).

funds), and required near real-time coordination of their wagers with Clase and Ortiz while the Bettors were spread across the country, there was probable cause to believe that evidence of the scheme would be found on their phones, which indeed was later found to be the case.

## A. The Undisputed Facts in the July Affidavits Establish Probable Cause

Neither Clase nor Ortiz seriously dispute a single one of the following allegations in the affidavits in support of the July Warrants (the "Clase Affidavit" and the "Ortiz July Affidavit," respectively, and collectively, the "July Affidavits") that give rise to probable cause that they were engaged in a pitch-rigging scheme and that evidence of the scheme would be found on their electronic devices:

### 1. There Was Probable Cause that Ortiz and Clase Had Engaged in the Scheme

The July Affidavits detailed the relationships among the relevant co-conspirators in the pitch-rigging scheme, showing that it was unlikely that their wagers on Ortiz and Clase were the result of happenstance among strangers. The information in the July Affidavits—including Betting Platform-2 records, cellphone historical cell-site location data, MLB ticketing records, financial transactions, and open-source information—showed that Clase and Ortiz are teammates, Bettor-1 and Clase are close associates, and Bettor-1 and the other Ortiz Bettors are associates, friends, and family. See Ortiz July Aff. ¶¶ 18–23; Clase Aff. ¶¶ 18–23.

The July Affidavits then outlined Bettor-1's history of successfully wagering on Clase's pitches on Betting Platform-2[10] from May 2023 through July 2025, which provided probable cause to believe—in conjunction with Bettor-1's relationship with Clase—that Bettor-1 had placed the wagers in coordination with Clase. This included Bettor-1's net profits (over

[10] The data indicated that Bettor-1 did not wager on Clase's pitches on Betting Platform-1.

$100,000) and high win-rates on wagers on Clase's pitches. For example, while Ortiz likens a bet on whether a pitch will be a ball or a strike to a "coin flip," Ortz Mot. at 5—which would mean one would expect a win rate of 50%—the July Affidavits explained that Bettor-1's win rate betting on Clase's pitches to be balls was 70%. See Ortiz July Aff. ¶ 25; Clase Aff. ¶ 25. The July Affidavits also included examples of three MLB games where Bettor-1 won thousands of dollars betting on Clase's pitches while attending MLB games with Clase's complimentary tickets, and when Betting Platform-2 geolocation data showed that Bettor-1 had accessed his/her Betting Platform-2 account from the Clase Residence before and/or after the relevant wagers. See Ortiz July Aff. ¶¶ 24–29; Clase Aff. ¶¶ 24–29.[11]

With respect to Ortiz's two pitches, the July Affidavits provided a detailed explanation of why the Ortiz Bettors' wagers and activity specifically associated with the two Subject Pitches were suspicious, especially when combined with Bettor-1's relationship with Clase (Ortiz's teammate) and Bettor-1's history of successful wagers on Clase's pitches. See Ortiz July Aff. ¶¶ 30–44; Clase Aff. ¶¶ 30–44.

As detailed above, with respect to Subject Pitch-1, the July Affidavit explained that on June 14, 2025—the day before Subject Pitch-1—Bettor-1 and Individual-1 accessed their

---

[11] Taking portions of the Clase Affidavit out of context, Clase seems to suggest that the Clase Affidavit inaccurately claimed that the Ortiz Bettors "placed bets on Mr. Clase's and Mr. Ortiz's pitches that 'had a significantly higher win rate[.]'" See Clase Mot. at 2 (citing Clase Aff. ¶ 25). But read in full, the relevant portion of the affidavit was not claiming that Bettor-1's overall win-rate on Clase was "significantly higher" than his/her other wagers, rather, the relevant sentence was explaining that while Bettor-1 won his 158 Pitch Speed bets on Clase twice as often as she/he lost them, Bettor-1's "larger wagers in this category had a significantly higher win rate. For example, of the 17 wagers between $1,000 and $5,000, [Bettor-1] won 15, lost one, and one was cancelled, for a win rate of 88%." Clase Aff. ¶ 25. Clase cannot seriously dispute that a win-rate of 88% is "significantly higher" than a win rate of "twice as often," which is approximately 66%.

Betting Platform-1 accounts from the same location, and that the following day, within 15 minutes of one other, Bettor-1 and Individual-1 wagered thousands of dollars on Subject Pitch-1 before the June 15 Game started. See Ortiz July Aff. ¶¶ 31, 33; Clase Aff. ¶¶ 31, 33.[12] Similarly, with respect to Subject Pitch-2, the July Affidavit detailed that Clase obtained complimentary tickets for Bettor-1 to attend the June 27 Game, that Bettor-1 accessed Betting Platform-2 from the Guardians' stadium, and that within one hour of each other—before the June 27 Game started—Bettor-1, Bettor-2, Bettor-3, and Bettor-4 wagered thousands of dollars on Subject Pitch-2 on Betting Platform-1. See Ortiz July Aff. ¶¶ 38–39; Clase Aff. ¶¶ 38–39. Even more suspiciously, in addition to their wagers on Betting Platform-1, Bettor-2 and Bettor-4 also placed additional wagers on Subject Pitch-2 on Betting Platform-2 as well. See Ortiz July Aff. ¶¶ 31, 33; Clase Aff. ¶¶ 31, 33. Overall, the Ortiz Bettors won over $60,000 betting that Ortiz's two pitches would be a Ball/HBP. See Ortiz July Aff. ¶¶ 33, 41; Clase Aff. ¶¶ 33, 41.[13]

[12] The fact that the Ortiz Bettors placed their wagers before they were aware of the in-game situation—for example, who Ortiz would be facing and whether that person was left or right-handed—underscores the suspicious nature of the bets.

[13] Ignoring the inherently suspicious nature of the bets on his two Subject Pitches, as well as Bettor-1, Ortiz argues that there is no evidence linking him to a conspiracy with Clase and the Ortiz Bettors, but only evidence that he and Clase were teammates. See Ortiz Mot. at 16–18. To the contrary, the July Affidavits make Ortiz's connection to the scheme and his co-conspirators crystal clear: Bettor-1—the very same individual who is close with Clase and engaged in suspicious wagering on Clase's pitches—also engaged in suspicious wagering on Ortiz's pitches; and the Ortiz Bettors, who are associates of Bettor-1, also engaged in suspicious wagering on Ortiz's pitches (including that they were for large dollar values, closely coordinated, and prior to the game). See Ortiz July Aff. ¶¶ 12, 19–44. The logical inference from these undisputed facts was that there was a fair probability that Clase and Bettor-1 were co-conspirators, and that Clase brought Ortiz into the scheme while Bettor-1 brought the other Ortiz Bettors into the scheme. An inference further corroborated by records obtained pursuant to the search warrants at issue here. Accordingly, to the extent Ortiz relies on cases, such as United States v. Lauria, 70 F.4th 106, 129 (2d Cir. 2023), in which the only allegation was that two people "know each other," they are inapposite.

Clase and Ortiz do not dispute a single one of the above-described facts, which on their own provide probable cause to believe that they were engaged in the pitch-rigging scheme. In addition, as described below, the July Affidavits included additional evidence of the Ortiz Bettors' gambling history that further enhanced the probable cause, but even absent that evidence, the July Affidavits were sufficient for the issuance of the July Warrants. Because the undisputed evidence plainly demonstrated close coordination and substantial winnings among Bettor-1 and the Ortiz Bettors, who had clear ties to Clase and Ortiz, it was sufficient for probable cause.

2. There Was Probable Cause to Search Ortiz and Clase's Electronic Devices for Evidence of the Scheme

With respect to probable cause to search Ortiz and Clase's electronic devices, the July Affidavits detailed that all of the Ortiz Bettors had Betting Platform-1 accounts and that all of the relevant Betting Platform-1 wagers were made on cellular telephones associated with the Bettors. See Ortiz July Aff. ¶ 16; Clase Aff. ¶ 16. The July Affidavits further explained that because many of the wagers were placed in the middle of MLB games played by Ortiz and Clase across the United States, and because the Ortiz Bettors themselves were also located in different states, based on the agent's training, experience, and participation in the investigation, it was likely that the coordination of such wagers involved the use of communication via mobile cellular devices. See Ortiz July Aff. ¶ 49; Clase Aff. ¶ 48. The July Affidavits further noted that based on the agents' training, experience, and participation in other investigations, he knew that individuals such as Ortiz, Clase, and the Ortiz Bettors frequently used their electronic devices to communicate with their associates, document and store information, and process financial transactions and sports wagers via mobile applications operated by online gambling platforms, and that individuals engaged in criminal activity frequently plan and execute their crimes on personal cell phones. See Ortiz July Aff. ¶ 50; Clase Aff. ¶ 49.

Furthermore, because Ortiz had recently been suspended, and because it was publicly reported that the suspension was centered on the suspicious wagers on the two Subject Pitches by Bettor-1 (who was a close associate of Clase) and the other Ortiz Bettors, it was reasonable to infer that Ortiz exchanged messages with Clase and other teammates about his suspension, which communications could also yield evidence of Ortiz and Clase's participation in the scheme. See Ortiz July Aff. ¶ 51; Clase Aff. ¶ 50.

Once again, Clase and Ortiz do not dispute a single one of the above-described statements from the July Affidavits. Rather, they argue that the July Affidavits did not establish probable cause that evidence of the scheme would be found on their electronic devices because the July Affidavits did not include direct evidence of such communications. See Ortiz Mot. at 16–17; Clase Mot. at 4–5. However, it is well-established that "[a] showing of nexus does not require direct evidence and may be based on 'reasonable inference' from the facts presented based on common sense and experience." United States v. Singh, 390 F.3d 168, 182 (2d Cir. 2004) (citation omitted). Moreover, "probable cause as to a person's criminal conduct can sometimes inform probable cause to search a place used or frequented by that person or to obtain records for electronic devices linked to that person." Lauria, 70 F.4th at 130 n.14. Neither Ortiz nor Clase has disputed the evidence in the July Affidavits, detailed above, which established probable cause that Ortiz and Clase were engaged in a nationwide pitch-rigging scheme that required real-time coordination among the pitchers, as the source of inside information, and the Bettors. That evidence "inform[ed] probable cause to search . . . electronic devices linked to" Ortiz and Clase. Id. And based on that evidence, as well as the additional evidence described below, two different Magistrate Judges reasonably inferred that there was probable cause to believe that evidence of the pitch-rigging scheme would be found on their electronic devices.

B. The Ortiz Bettors' Gambling History Supported Probable Cause to Issue the July Warrants and Contained No Material Misstatements or Omissions

In addition to the above-described evidence, the July Affidavits also provided analysis of the Ortiz Bettors' historical gambling behavior (or lack thereof), which demonstrated that their wagers on Subject Pitch-1 and Subject Pitch-2 were outside of their ordinary behavior, and thus another indication that the Ortiz Bettors' wagers on the Subject Pitches were part of the pitch-rigging scheme. See Ortiz July Aff. ¶¶ 35–37, 43–44; Clase Aff. ¶¶ 35–37, 43–44. This information strongly supported the probable cause determination, and the omission of other data from the analysis, which if included would not negate probable cause, does not constitute a "substantial preliminary showing" that any "omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth" meriting a Franks hearing. Salameh, 152 F.3d at 113.

1. The July Affidavits Included Statistical Analysis of the Historical Data

Clase and Ortiz argue that the historical analysis was "conclusory and unsupported" because it did not include "means, medians, ranges, standard deviations, z-scores or any other basic statistical measures." See Ortz Mot. at 18. This is nonsense. In fact, as detailed below, the July Affidavits provided analysis supporting the conclusion that each of the five Ortiz Bettors' wagers on Subject Pitch-1 and Subject Pitch-2 were outside of their regular gambling behavior. See Ortiz July Aff. ¶¶ 35–37, 43–44; Clase Aff. ¶¶ 35–37, 43–44.[14] This included, among other things, a comparison of their average wagers (in other words, the "mean" that Ortiz and Clase claim were not calculated) to their wagers on the Subject Pitches:

[14] Because the July Affidavits provided examples of how the historical data supported the conclusion that the wagers were outliers from the Ortiz Bettors' gambling history, the out-of-district cases that Ortiz cites, in which he claims no context was provided for statistics in search warrant affidavits, are irrelevant. See Ortiz Mot. at 20–22.

| Bettor | Mean Wager | Wager on Subject Pitch | Affidavit Cite |
|---|---|---|---|
| Individual-1 | $19 | $2,000 | Ortiz July Aff. ¶ 35<br>Clase Aff. ¶ 35 |
| Bettor-1 | $22 | $3,000 | Ortiz July Aff. ¶ 36<br>Clase Aff. ¶ 36 |
| Bettor-2 | $335 | $3,250 | Ortiz July Aff. ¶ 43<br>Clase Aff. ¶ 43 |
| Bettor-3 | $0<br>(No Prior Bets) | $1,200 | Ortiz July Aff. ¶¶ 41, 43<br>Clase Aff. ¶¶ 41, 43 |
| Bettor-4<br>(Betting Platform-1) | $175 | $1,000 | Ortiz July Aff. ¶ 43<br>Clase Aff. ¶ 43 |
| Bettor-4<br>(Betting Platform-2) | $171 | $500 | Ortiz July Aff. ¶ 44<br>Clase Aff. ¶ 44 |

While Ortiz and Clase claim that additional gambling data analysis ought to have been provided in the July Affidavits, they do not argue that any of the gambling data analysis in the July Affidavits was wrong.[15] The defendants cite no authority supporting their position that in this context—where the Ortiz Bettors' wagers on the Subject Pitches were up to 136 times greater than their average wagers—the government was also required to calculate and provide the magistrate judges with standard deviations and Z-scores to demonstrate that these wagers were outside of the Ortiz Bettors' ordinary behavior.

Moreover, Ortiz does not even attempt to explain why these particular statistical factors are so necessary that their absence negates probable cause, but, even if he had, the Magistrate Judges were well within their discretion to determine that the information supplied was sufficient. Indeed, Ortiz's argument totally ignores the standard governing probable cause in a search warrant. As the Supreme Court explained in Illinois v. Gates, "warrants are—quite properly []—issued on the basis of nontechnical, common-sense judgments of laymen applying a

---

[15] While they do claim that that the July Affidavits omitted other data points that render it misleading—which as detailed below, is inaccurate—they do not claim that the information presented was incorrect.

standard less demanding than those used in more formal legal proceedings." 462 U.S. at 235–36. Ortiz seeks to supplant the "common-sense" "nontechnical" standard with its very opposite—a requirement of a technical, statistical analysis, but no such requirement is found in the law. See United States v. Ventresca, 380 U.S. 102, 108 (1965) ("[A]ffidavits for search warrants. . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. . . . Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area."); United States v. Martin, 426 F.3d 68, 74 (2d Cir. 2005) (explaining probable cause as a "practical, common-sense decision") (quoting Gates) (emphasis in Martin); United States v. Travisano, 724 F.2d 341, 345–46 (2d Cir. 1983) (explaining that the warrants should be reviewed "practically and in a commonsense fashion" and not "stringent, technical or grudging"). And Ortiz fails to grapple at all with the "considerable deference to the probable cause determination of the issuing magistrate," Walczyk, 496 F.3d at 157. That is because there is no serious argument that the Magistrate Judges were outside the bounds of their discretion in issuing the July Warrants.

The July Affidavits also included data underlying the "mode" and "range" for several of the Ortiz Bettors—precisely the information the defendants claim was omitted. For example, for Bettor-2, the July Affidavit provided that while Bettor-2 "had made 26 wagers on Ortiz-related pitches, only five were bets of over $1,000, with the rest between $25 and $380." Ortiz July Aff. ¶ 37; Clase Aff. ¶ 37. Similarly, for Bettor-4, the July Affidavits explained that aside from the two wagers totaling $1,000 on Subject Pitch-2 on Betting Platform-1, Bettor-4 had placed "nine wagers of $2, one wager of $50, one wager of $350, one wager of $650, and one wager of $1,205." See Ortiz July Aff. ¶ 43; Clase Aff. ¶ 43. Overall, because the Magistrate Judges appropriately concluded that there was probable cause based on the totality of the

information in the July Affidavits, including but not limited to the historical gambling analysis in the July Affidavits, no further data analysis was necessary. See Gates, 462 U.S. at 236 ("[S]o long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.").

2. The July Affidavits Did Not Misrepresent the Historical Gambling Data

In the same vein, Clase and Ortiz also argue that the July Affidavits intentionally or recklessly misrepresented the historical gambling data for the Ortiz Bettors through "the omission of other critical data," thus requiring a Franks hearing. See Ortiz Mot. at 25–32. Once again, there is no claim that the historical gambling data that was presented to the Magistrate Judges was a misrepresentation, but only that it omitted information and thus "cherry-picked." While a violation of Franks can be based on alleged omissions, see Awadallah, 349 F.3d at 64, "[o]missions are not subject to the same high level of scrutiny as misstatements," Rivera, 750 F. Supp. at 617. This is because (1) "all storytelling involves an element of selectivity," and it is therefore "not shocking that every affidavit will omit facts which, in retrospect, seem significant," United States v. Vilar, No. 05-CR-621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007) (internal quotation marks omitted); and (2) "allegations of omission potentially open officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit," United States v. Mandell, 710 F. Supp. 2d 368, 374 (S.D.N.Y. 2010). Therefore, "as a practical matter the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." Id. (internal quotation marks omitted).

But regardless, the July Affidavits did no such thing, and the only way that Ortiz and Clase can plausibly attempt their argument is by cherry-picking their own additional specific

data points that they claim ought to have been included in the July Affidavits. Not only are Ortiz and Clase wrong that the limited additional metrics they propose negate probable cause, they also ignore the undisputed relevant facts, outlined above, all of which indicate that the Ortiz Bettors' wagers on Subject Pitch-1 and Subject Pitch-2 were highly suspicious. See supra at 27–29.

a. Individual-1, Bettor-2, Bettor-3, and Bettor-4

With respect to Individual-1, Bettor-2, Bettor-3, and Bettor-4, Clase and Ortiz's arguments are borderline frivolous, easily refuted, and nowhere approach the standard for showing that the July Affidavits contained intentional misrepresentations or omissions.

**Individual-1.** The July Affidavits provided that before the June 15 Game, Individual-1 placed a $2,000 wager that Subject Pitch-1 would be a Ball/HBP, which resulted in winnings of $2,000. See Ortiz July Aff. ¶¶ 33, 35; Clase Aff. ¶¶ 33, 35. Betting Platform-1 records showed that in contrast to the $2,000 wager on Subject Pitch-1, Individual-1's average Betting Platform-1 wager on baseball was approximately $19. See Ortiz July Aff. ¶ 35; Clase Aff. ¶ 35. Moreover, the Betting Platform-1 records showed that this was Individual-1's largest wager, with his/her next largest wager roughly half the size: $1,296. See Ortiz July Aff. ¶ 35; Clase Aff. ¶ 35. In addition, this was the only instance that Individual-1 had ever wagered that a certain pitch would be a Ball/HBP. See Ortiz July Aff. ¶ 35; Clase Aff. ¶ 35.

Ortiz and Clase only take issue with the final data point: that this was the only instance that Individual-1 had ever wagered that a certain pitch would be a Ball/HBP. They do not dispute that this is true. Rather, they claim that "[Individual-1] also regularly made prop bets akin to the one" placed on Subject Pitch-1, Ortiz. Mot. at 7 (emphasis added)—namely 11 other wagers that certain pitches would be strikes—and argue that it was a material omission not to include those 11 wagers in the July Affidavits.

First, the July Affidavit's comparison of apples-to-apples—comparing this wager on a Ball/HBP to the fact that there were no other similar wagers previously—was a reasonable definition of the type of bet, and the defendants provides no basis for their argument that the 11 wagers on strikes ought to have been included except their view that it would materially alter the analysis. Second, even incorporating the strikes into the analysis, it is not true that Individual-1 made any of these bets "regularly," and they do not fundamentally alter the conclusion that Individual-1's bet on Subject Pitch-1 was outside of her/his regular gambling behavior. Betting Platform-1 data showed that of Individual-1's thousands of wagers on baseball between 2022 and 2025, Individual-1 had only placed those 11 other wagers on pitch result, and all 11 were in a two-day span: May 3, 2024, to May 4, 2024. Thus, even incorporating those 11 on two days, Individual-1 did not "regularly" wager on Pitch Speed.

Furthermore, Ortiz and Clase fail to acknowledge that unlike the $2,000 wager that Subject Pitch-1 would be a Ball/HBP, Individual-1's average wager on the other 11 bets was $33. Thus, even if this information had been provided to the Magistrate Judges, it would not have indicated that Individual-1's wager on Subject Pitch-1 was within his/her regular gambling behavior. Instead, it would have provided additional evidence that Individual-1's wager was outside of the ordinary: it was the only time Individual-1 ever wagered that a pitch would be a Ball/HBP, and it was roughly 60 times larger than his/her other 11 wagers on the type of pitch.

**Bettor-2.** The July Affidavits explain that Bettor-2 placed suspicious wagers on both Subject Pitches and on both Betting Platform-1 and Betting Platform-2. With respect to Subject Pitch-1, the July Affidavits provide that Bettor-2 placed two bets totaling $8,438 on Betting Platform-2 that Subject Pitch-1 would be a Ball/HBP, resulting in winnings of approximately $21,095. See Ortiz July Aff. ¶ 33; Clase Aff. ¶ 33. With respect to Subject Pitch-2,

the July Affidavits describe that, like Bettor-1, Bettor-3, and Bettor-4, before the June 27 Game started, Bettor-2 placed three bets totaling $3,250 on Betting Platform-1 that Subject Pitch-2 would be a Ball/HBP. See Ortiz July Aff. ¶ 39; Clase Aff. ¶ 39. Shortly thereafter, Bettor-2 placed two additional wagers totaling $9,900 that Subject Pitch-2 would be a Ball/HBP. See Ortiz July Aff. ¶ 40; Clase Aff. ¶ 40. Bettor-2 ultimately won approximately $30,135 ($3,900 from Betting Platform-1 and $26,235 from Betting Platform-2) on Subject Pitch-2. See Ortiz July Aff. ¶ 41; Clase Aff. ¶ 41.

Betting Platform-2 records showed that while Bettor-2 had made 26 wagers on Ortiz-related pitches, only five were bets of over $1,000, with the rest between $25 and $380. See Ortiz July Aff. ¶ 37; Clase Aff. ¶ 37. Of the five wagers over $1,000, all five wagers related to Subject Pitch-1 and Subject Pitch-2, and Bettor-2 won all five, for a total payout of approximately $53,000. See Ortiz July Aff. ¶ 37; Clase Aff. ¶ 37. Betting Platform-1 records showed that Bettor-2's three bets totaling $3,250 were far larger than his/her average wager on Betting Platform-1, which was approximately $335, and, in the aggregate, constituted the largest wager she/he placed on Betting Platform-1. See Ortiz July Aff. ¶ 43; Clase Aff. ¶ 43. Finally, the July Affidavits also provide, "In my training and experience, and based on the investigation to date, I believe that the [Betting Platform-1] records indicate that [Bettor-2's] wagers on the June 15 Game and the June 27 Game … were outside of [her/his] regular gambling behavior." See Ortiz July Aff. ¶ 37; Clase Aff. ¶ 37.

The defendants, again, do not claim that a single piece of the above information about Bettor-2 is false. Rather, they first incorrectly claim that there is "no [] mention" of Betting Platform-1 data for Bettor-2 in the July Affidavits, seeming to suggest that somehow it was false or misleading for the July Affidavit to claim in paragraph 37 that Betting Platform-1 records

indicated that Bettor-2's wagers were outside of his/her regular gambling behavior. See Ortiz Mot. at 30. This is a bizarre argument. Ortiz and Clase cannot seriously dispute that, as noted above, paragraph 43 expressly provides an analysis of Bettor-2's wagers on Betting Platform-1: Bettor-2's "three bets totaling $3,250 on Subject Pitch-2 were far larger than [his/her] average wager on [Betting Platform-1]. See Ortiz July Aff. ¶ 43 (emphasis added); Clase Aff. ¶ 43 (same). Indeed, in a more perplexing twist, in literally the very next paragraph of his brief, Ortiz argues that by "focusing only on [Betting Platform-1]," the analysis of Bettor-2's gambling history had a material omission. See Ortiz Mot. at 30 (emphasis added). Put another way, in one paragraph he claims the July Affidavit was misleading because there was no analysis of data from Betting Platform-1, and in the next, that the July Affidavit was misleading for analyzing "only" data from Betting Platform-1.

In fact, neither is true. The July Affidavit discussed Bettor-2's history of gambling on both Betting Platform-1 and Betting Platform-2. See Ortiz July Aff. ¶¶ 37, 43; Clase Aff. ¶¶ 37, 43. Neither Ortiz nor Clase point to a single fact from either Betting Platform that, were it included, would render the statements in the July Affidavit about Bettor-2 false or negate probable cause.[16]

**Bettor-3.** The July Affidavits provide that before the June 27 Game began, Bettor-3 placed the one and only wager that Bettor-3 had ever placed: a bet of $1,200 that Subject Pitch-2 would be a Ball/HBP, which resulted in winnings of $1,440. See Ortiz July Aff. ¶¶ 39,

[16] Compounding the silliness of this argument, while the July Affidavit did analyze Bettor-2's gambling history on Betting Platform-1, the quoted reference in paragraph 37, which otherwise deals with Betting Platform-2, appears to have been a typographical error, and should have read Betting Platform-2. Nevertheless, because Bettor-2's data on both Betting Platforms was analyzed, and because the data from both Betting Platforms supports the conclusion in the July Affidavit, the defendant's argument fails.

41; Clase Aff. ¶¶ 39, 41. Ortiz and Clase argue that because this was Bettor-3's only wager, the July Affidavits included a material misstatement by claiming that Bettor-3's wager was outside of Bettor-3's "regular gambling behavior." See Ortiz Mot. at 31–32. This is not a serious argument for two reasons. First, because Bettor-3 had never previously bet on sports, it was reasonable to say that Bettor-3's $1,200 bet on Subject Pitch-2 was outside of his/her regular gambling behavior: regularly, Bettor-3 did not gamble. Second, and equally important, the July Affidavits explicitly disclosed that this was Bettor-3's only wager, and so in context, it was not misleading, because all relevant information had been placed before the Magistrate Judges.

**Bettor-4.** The July Affidavits provided that Bettor-4 not only placed multiple wagers on Subject Pitch-2, he/she did so on multiple Betting Platforms. See Ortiz July Aff. ¶¶ 39–40; Clase Aff. ¶¶ 39–40. Before the June 27 Game, Bettor-4 placed two bets totaling $1,000 on Betting Platform-1, and two hours later, Bettor-4 placed an additional wager of $500 on Betting Platform-2, all that Subject Pitch-2 would be a Ball/HBP, resulting in total winnings of $3,084. See Ortiz July Aff. ¶¶ 39–41; Clase Aff. ¶¶ 39–41.[17] Like Individual-1 and Bettor-3, this was the only instance in which Bettor-4 had ever wagered on a Ball/HBP. See Ortiz July Aff. ¶ 43; Clase Aff. ¶ 43. Furthermore, Bettor-4's average wager on Betting Platform-1 was approximately $175 (compared to $1,000 for Subject Pitch-2) and on Betting Platform-2 was $171 (compared to $500 for Subject Pitch-2). See Ortiz July Aff. ¶¶ 43–44; Clase Aff. ¶¶ 43–44.

Ortiz and Clase argue that because Bettor-4's average wagers were not so different from her/his wagers on Subject-Pitch 2, the July Affidavits included a material misstatement by claiming that Bettor-4's wager was outside of Bettor-3's "regular gambling behavior." See Ortiz

[17] As noted in the July Affidavits, one of Bettor-4's wagers lost because it was a parlay bet in which the other leg did not succeed. See Ortiz July Aff. ¶ 41 n.3; Clase Aff. ¶ 41 n.2.

Mot. at 31. Putting aside that they wholly ignore that this was Bettor-4's only wager that a pitch would be a Ball/HBP, as with their arguments about Bettor-3, this claim crumbles quickly under its own weight. They do not claim that the average wagers listed in the July Affidavits was incorrect: even using Ortiz and Clase's calculations,[18] Bettor-4's wagers on Subject Pitch-2 were above Bettor-4's average wagers:

| | Average in July Affidavits (Ortiz July Aff. ¶ 43 Clase Aff. ¶ 43) | Defendant Claimed Average (Ortiz Mot. at 31) | Bet on Subject Pitch-2 |
|---|---|---|---|
| Betting Platform-1 | $175 | $454 | $500 each ($1,000 total) |
| Betting Platform-2 | $171 | $333.72 | $500 |

Thus, even under their own logic, there was no misstatement, and when taken together with the other undisputed facts—including that Bettor-4 wagered on Subject Pitch-2 across multiple Betting Platforms (among them bets before the June 27 Game), and this was his/her only bet ever on a Ball/HBP—the July Affidavits appropriately characterized Bettor-4's wagers on Subject Pitch-2.

b. Bettor-1

While lengthier, the defendants' arguments that the gambling analysis for Bettor-1 omitted material information that could negate probable cause fares no better. The July Affidavits explain that Bettor-1 placed suspicious wagers on both of the Subject Pitches. With respect to Subject Pitch-1, the July Affidavits provide that just like Individual-1, before the June 15 Game began, and thus before Bettor-1 knew the batter for Subject Pitch-1, Bettor-1 placed two bets of

[18] Although it is ultimately immaterial for the reasons described below, Ortiz does not explain his calculation of these averages, which vary from those set forth in the July Affidavits (which Ortiz does not challenge).

$1,500 each ($3,000 total) that Subject Pitch-1 would be a Ball/HBP, resulting in winnings of approximately $3,000. See Ortiz July Aff. ¶ 33; Clase Aff. ¶ 33. In contrast to the two $1,500 wagers on Subject Pitch-1, Bettor-1's average Betting Platform-1 wager on baseball was approximately $22. See Ortiz July Aff. ¶ 36; Clase Aff. ¶ 36. Moreover, the combined $3,000 that Bettor-1 wagered on Subject Pitch-1 matched Bettor-1's largest wager ever on a single event on Betting Platform-1. See Ortiz July Aff. ¶ 36; Clase Aff. ¶ 36. In addition, Bettor-1 had only ever made five wagers on Betting Platform-1 that a particular pitch would be a Ball/HBP, and all five were on pitches thrown by Ortiz—two were on Subject Pitch-1, two were on Subject Pitch-2, and one was in between them, on June 21, 2025. See Ortiz July Aff. ¶ 36; Clase Aff. ¶ 36. In other words, before Bettor-1's bet on Subject Pitch-1, he had never previously placed a wager on Betting Platform-1 that a pitch would be a Ball/HBP. With respect to Subject Pitch-2, the July Affidavits detail that just as with Subject Pitch-1, and like Bettor-2 and Bettor-4, Bettor-1 wagered before the June 27 Game began—Bettor-1 placed two bets on Betting Platform-1 totaling $2,500, resulting in winnings of approximately $2,400.[19]

Ortiz and Clase do not dispute any of these facts and ignore the bulk of them. Instead, they argue that the July Affidavits misrepresented that Bettor-1's wagers were outside of her/his regular gambling behavior because (1) the fact that her/his two $1,500 wagers ($3,000) equaled Bettor-1's other highest wager on Betting Platform-1 does not support the argument; and (2) the analysis omitted that Bettor-1 had bet that other pitches would be Ball/HBPs, albeit not on Betting Platform-1. See Ortiz Mot. at 26–29. Neither argument has merit.

[19] As noted in the July Affidavits, one of Bettor-1's wagers lost because it was a parlay bet in which the other leg did not succeed. See Ortiz July Aff. ¶ 41 n.3; Clase Aff. ¶ 41 n.2.

**1. Bettor-1's $3,000 Wagers on Subject Pitch-1.** The July Affidavits explained that Bettor-1's two parlay wagers of $1,500 each on Subject Pitch-1 "matched [his/her] largest wager on a single event" on Betting Platform-1. See Ortiz July Aff. ¶ 36; Clase Aff. ¶ 36. This statement is undisputed. The defendants claim that this was nonetheless misleading because the fact that two wagers equaled Bettor-1's other largest wager on a single event did not show that the wagers were outside of Bettort-1's "regular gambling behavior." Ortiz Mot. at 26. But as Ortiz concedes, the government explained its reasoning, see id. at 26 ("the very data briefly mentioned in the July Affidavit contradicts this conclusion"), and thus there is no basis to claim that anything was omitted or misstated. Rather, this is just the defendants disagreeing about the conclusion, which the Magistrate Judge was also free to do (but did not).[20]

The defendants also claim that the July Affidavits "ignored" Bettor-1's parlay bets, round robin bets, and wagers on Betting Platform-2. While their point is not totally clear, and they provide no concrete examples (which is fatal to their Franks argument), they seem to suggest that including those wagers would have increased Bettor-1's wager size and thus rendered false the statement in the July Affidavits that the $3,000 wagers on Subject Pitch-1 were Bettor-1's largest wagers. See Ortiz Mot. at 27. With respect to parlay bets, the July Affidavits considered data from the Betting Platforms that included parlay bets. See, e.g., Ortiz July Aff. ¶¶ 29 n.2, 41 n.3; Clase Aff. ¶¶ 29 n.1, 41 n.2. With respect to round robin bets, they are, by definition, separate bets. See, e.g., FanDuel, What is a Round Robin, https://support.fanduel.com/s/article/What-is-a-

[20] The other two $1,500 wagers were in-fact the other legs of each of Bettor-1's two parlay bets on Subject Pitch-1 on June 15, 2025. In other words, had the government provided additional information about Bettor-1's largest wagers to the Magistrate Judges, or added them together as the defendant suggests below, it would have only strengthened the probable cause, because it showed that Bettor-1's wagers on Subject Pitch-1—when including both legs of the parlays—were Bettor-1's largest wagers ever on Betting Platform-1.

Round-Robin ("A Round Robin is an easy way to place multiple parlays at once. When you place a Round Robin, you're placing individual bets on every possible parlay") (emphasis added). The defendants provide no reason to combine separate round robin bets except for their desire to argue for an artificially inflated wager size, though they provide no examples. With respect to Betting Platform-2 data, the analysis in the July Affidavit was explicitly only based on "records from [Betting Platform-1]," and thus it was not misleading to do so. See Ortiz July Aff. ¶¶ 35–36; Clase Aff. ¶¶ 35–36.

Equally importantly, to make the required showing that any omissions were material, the defendant must show that "if the omitted material had been included in the affidavit, the affidavit would [not] establish probable cause[.]" Rajaratnam, 719 F.3d at 146. Ortiz and Clase do not show how failing to accumulate parlay bets, round robin bets, or include Betting Platform-2 data resulted in a material misrepresentation or omission

**2. Bettor-1's Five Ball/HBP Wagers on Betting Platform-1.** The July Affidavits also explained that Bettor-1 had only ever made five wagers on Betting Platform-1 that a particular pitch would be a Ball/HBP, and all five were on pitches thrown by Ortiz: two on Subject Pitch-1, two on Subject Pitch-2, and one on June 21, 2025. See Ortiz July Aff. ¶ 36; Clase Aff. ¶ 36. The defendants do not claim that this was a misstatement. But just as with Individual-1, see supra at 31–32, the defendants claim that the appropriate comparison was not just to Ball/HBP wagers, but to Bettor-1's wagers on strikes on Betting Platform-1 as well. As noted previously, there is no reason to think that comparing bets on Ball/HBP to bets on strikes is the appropriate comparison, but regardless, including it does not negate probable cause; it strengthens it, as discussed below.

Based on Ortiz's calculations (Ortiz Mot. at 27–28), of Bettor-1's "5,000" wagers on Betting Platform-1, Bettor-1 placed only 41 wagers that pitches would be strikes and five

wagers that pitches would be a Ball/HBP (the five on Ortiz). Without any explanation, Ortiz asserts that "the fact that [Bettor-1] often bet on the inverse scenario of a pitch being a ball does not mean betting on a pitch being a ball is unusual for [her/him]." Ortiz Mot. at 28. But where Bettor-1 made 46 wagers on pitch type, only five on a pitch being a Ball/HBP are unusual. And where Bettor-1 made 5,000 wagers on Betting Platform-1, the fact that only five were wagers that a pitch would be a Ball/HBP, all five were on Ortiz, and four were on the Subject Pitches speaks volumes.[21]

Ortiz's argument that the July Affidavits intentionally omitted Betting Platform-2 data from the analysis of Bettor-1's pitch type bets fares no better. See Ortiz Mot. at 29. The July Affidavits were explicit that the claim regarding the five Ball/HBP wagers was only with respect to Betting Platform-1 data. See Ortiz July Aff. ¶¶ 35–36; Clase Aff. ¶¶ 35–36. Regardless, factoring in the Betting Platform-2 data would, once again, only strengthen the probable cause, because it would emphasize the unusual size and winning rate of Bettor-1's wagers on Ortiz and Clase, as compared to her/his wagers on other pitchers throwing a Ball/HBP. Specifically, the Betting Platform-2 data from the time of the July Warrant reflected that Bettor-1 made approximately 266 wagers that pitches would be a Ball/HBP, including approximately 37 bets on Clase's pitches and three wagers on Ortiz's pitches (two of which were on Subject Pitch-2). Whereas Bettor-1's average wager that a Clase pitch would be a Ball/HBP was $428, or that an

---

[21] Ortiz conspicuously neglects to inform the Court that while Bettor-1's average wager on the five bets that Ortiz's pitches would be a Ball/HBP was $1,101, Bettor-1's average wager on the 41 other bets that pitches would be strikes was $49. Further, Bettor-1 only won two of her/his 41 wagers that pitches would be strikes—a win rate of 4.88%; by contrast, Bettor-1 won three out of his/her five bets that Ortiz's pitches would be a Ball/HBP—two on Subject Pitch-1 and one on Subject Pitch-2, for a win rate of 60% (and as noted above, a second bet on Subject Pitch-2 only lost because an unrelated parlay leg lost; Bettor-1's win rate on the Ball/HBP wagers themselves was actually 80%)—and the fifth wager for the pitch on June 21, 2025, was for six dollars.

Ortiz pitch would be a Ball/HBP was $290, Bettor-1's average wager when the pitchers were not Clase or Ortiz was only approximately $75. In other words, on average Bettor-1's wagers on Betting Platform-2 that Clase's and Ortiz's pitches would be a Ball/HBP were many times as large as his/her average wager that a pitch would be a Ball/HBP.

Similarly, as noted in the July Affidavits, Bettor-1's win rate on Betting Platform-2 for her/his wagers on Clase's pitches to be a Ball/HBP was approximately 70%, winning 26 wagers (a gain of $32,295), losing only 10 wagers (a loss of $3,768.62), and cancelling one wager, for net profits of approximately $28,526. See Ortiz July Aff. ¶ 25; Clase Aff. ¶ 25. With respect to Ortiz, combining Bettor-1's five wagers on Betting Platform-1 with his/her three wagers on Betting Platform-2 (as the defendants claim is appropriate), Bettor-1's win rate on Ortiz's pitches to be a Ball/HBP was 75%, because he won six of those eight bets (though one lost only because the other unrelated leg of the parlay was unsuccessful; if included the win on the leg would raise her/his win rate to 87.5%), for a payout of approximately $7,500. By contrast, Bettor-1's win rate for his/her 226 non-Ortiz and non-Clase bets that pitches would be a Ball/HBP was only 37.5%, winning 83 wagers (a gain of $15,390.36), losing 138 wagers (a loss of $9,675), and cancelling six wagers, for net profits of approximately $5,715. In other words, Bettor-1's win rate on Clase and Ortiz pitches being a Ball/HBP was about twice as high as her/his win rate for betting that other pitchers would throw a Ball/HBP. Even more telling, Bettor-1 won more money on just his seven Ortiz bets ($7,500) than on his/her other 226 bets combined ($5,715), and won far more on her/his 37 wagers on Clase's pitches ($28,526)

The data all points in one direction, and that is toward the conclusion in the July Affidavits that Bettor-1's wagers on Ortiz and Clase were outside of their regular gambling behavior and highly suspect. Accordingly, there was no material omission that could negate

probable cause, let alone any that would support a substantial preliminary showing that any omissions were intentional or reckless.

C. The Description of Ortiz's Loan from Loan Company-1 Was Accurate

Ortiz also argues that the description of his obligation to repay Loan Company-1 as a "debt" was an intentional or reckless material misstatement. See Ortiz Mot. at 24–25. But Ortiz's arrangement with Loan Company-1 was a debt, and regardless, the description in the Ortiz July Warrant was not misleading.

A "debt" is "a specific sum of money due by agreement or otherwise." Black's Law Dictionary (12th ed. 2024). Here, that definition plainly fits the relationship between Ortiz and Loan Company-1, pursuant to which Ortiz agreed to repay a loan to Loan Company-1. Although Ortiz only agreed to repay the debt through his MLB salary, that only serves to render it as a specific type of debt—a "nonrecourse debt," defined as a "debt for which the borrower is not personally liable, so that a creditor can collect only on the collateral securing the debt," id.—it does not change the fundamental nature of Ortiz's obligation to repay Loan Company-1—both principal and interest—for his loan.[22] Accordingly, it was not a misstatement to describe Ortiz's obligation to Loan Company-1 as a "debt."

Moreover, as Ortiz concedes, immediately following the use of the word "debt," the July Ortiz Warrant (at ¶ 47) accurately described the nature of the Loan Company-1 arrangement as an agreement in which Loan Company-1 "advances money to professional athletes

[22] Ortiz incorrectly claims that under his agreement with Loan Company-1, he was only required to pay a "percentage of [his] future baseball earnings, if any." See Ortiz Mot. at 24. By its terms, Loan Company-1's "Loan Agreement" included a repayment schedule, under which Ortiz was required to pay the lesser of (1) the specific amounts listed in the payment schedule or (2) 50% of his MLB compensation. But regardless, even if Ortiz only had to repay his loan through a fixed percentage of his earnings, it would still be a nonrecourse debt.

in exchange for payments on future earnings," see Ortiz Mot. at 25 ("This correct understanding of [Loan Company-1] business model"). Thus, regardless of whether the word "debt" was the appropriate descriptor, in context, it could not be a material misstatement because the Court had the relevant information about the nature of Ortiz's obligation to repay Loan Company-1. The Magistrate Judges were thus provided the information from which they could agree or disagree with the inference presented by the government about how Ortiz's debt to Loan Company-1 was a potential motive for his engagement in the pitch-rigging scheme.

III. There is No Basis to Suppress Ortiz's Device Seized Pursuant to the November Warrant

As detailed above, on November 5, 2025, the grand jury charged Ortiz and Clase with the Indictment Offenses and issued warrants for their arrest. See ECF No. 1. On November 9, 2025, Ortiz was arrested and law enforcement agents seized a cellular telephone in his custody incident to his arrest. Five days later, on November 14, 2025, Magistrate Judge Marutollo authorized the November Warrant, which allowed the agents to search Ortiz's phone seized incident to arrest, both for evidence of the Indictment Offenses and evidence of the Obstruction Offenses. Ortiz now argues that his phone was initially seized unlawfully without a warrant, the five-day[23] delay between the seizure of the device incident to Ortiz's arrest and law enforcement's obtaining of the November Warrant was unconstitutional, the November Warrant was not supported by probable cause for the Obstruction Offenses, and the affidavit in support of the

[23] Ortiz incorrectly claims that the delay was nine days. See, e.g., Ortiz Mot. at 10, 34. This error seems to stem from Ortiz confusing the date the grand jury returned the indictment (November 5, 2025, which was nine days before the November Warrant was issued), with the day of Ortiz's arrest and the seizure of his device (November 9, 2025, which was five days before the November Warrant was issued).

November Warrant (the "November Affidavit") had material omissions meriting a Franks hearing. None of these arguments have merit.

A. Ortiz's Phone was Lawfully Seized Incident to His Arrest for the Indictment Offenses

Ignoring 100 years of Supreme Court precedent, Ortiz first argues that it was unlawful to seize his device incident to his arrest without a warrant. See Ortiz Mot. 34–37. In Riley v. California, the Supreme Court explained that since at least 1914, it had been "well accepted" that a search incident to arrest "constitutes an exception to the warrant requirement." 573 U.S. 373, 382 (2014). Even more on the nose, in Riley, the Supreme Court held that the Fourth Amendment "permits the warrantless seizure of a cell phone incident to an arrest, but requires a warrant to search it." United States v. Corbett, No. 20-CR-213 (KAM), 2021 WL 4480626, at *4 (E.D.N.Y. Sept. 30, 2021) (citing Riley); see Riley, 573 U.S. at 403 (noting that "before searching a cell phone seized incident to an arrest" law enforcement must "get a warrant") (emphasis added); United States v. Chowdhury, No. 23-CR-278 (NRM), 2025 WL 2987917, at *11 (E.D.N.Y. Oct. 22, 2025) ("The seizure of evidence from a search incident to arrest 'requires no additional justification; rather, it is the fact that the lawful arrest which establishes the authority to search a person, and to seize evidence from that search.") (citation omitted).

In accordance with Riley, and contrary to the defendant's argument (Ortiz Mot. at 36–37), no additional exigent circumstance is required to seize a phone incident to a lawful arrest in order to subsequently apply for a warrant to search it. Here, Ortiz was arrested pursuant to a lawful arrest warrant for the Indictment Offenses, and his phone was seized incident to that arrest. Accordingly, law enforcement agents appropriately seized Ortiz's phone incident to his arrest

in order to apply for a warrant to search the device for evidence of the Indictment Offenses[24] among other crimes, just as Riley contemplated. See Riley, 573 U.S. 373 (2014).

B. The Five-Day Delay Before Obtaining the November Warrant Was Reasonable

Ortiz next argues that it was unreasonable and therefore unconstitutional for law enforcement agents to obtain a warrant to search his phone five days after his arrest and the seizure of his device incident to his arrest. See Ortiz Mot. at 38-39. This argument has no support in the law and should be rejected.

As the Second Circuit explained in United States v. Smith, "[i]t is common for the police to temporarily seize a suspect's personal property if they have probable cause and intend to apply for a warrant to search the property for evidence of a crime." United States v. Smith, 967 F.3d 198, 202 (2d Cir. 2020). "When the police seize property in this manner, the Fourth Amendment requires that they act diligently in applying for a search warrant." Corbett, 2021 WL 4480626, at *2 (citing Smith). "To determine whether a delay [] in applying for a search warrant is reasonable, courts must 'balance the nature and quality of the intrusion on the individual's Fourth Amendment rights against the government interests alleged to justify the intrusion.'" Id. (quoting United States v. Place, 462 U.S. 696, 703 (1983)). "In Smith, the Second Circuit identified four '[g]eneral relevant considerations' for the court to consider in evaluating the reasonableness of any delay in obtaining a warrant to search seized property: (1) the length of the delay; (2) the importance of the seized property to the defendant; (3) whether the defendant has a reduced

[24] Ortiz only argues that there was not probable cause for the Obstruction Offenses. See Ortiz Mot. at 35-36. While there was probable cause to search the device for both the Indictment Offenses and the Obstruction Offenses, because, at a minimum, Ortiz was arrested pursuant to a lawful arrest warrant for the Indictment Offenses, and because there was probable cause for the Indictment Offenses, the warrantless seizure of Ortiz's phone incident to his arrest in order to apply for the November Warrant was lawful.

property interest in the seized property; and (4) the government's justification for the delay." Id. (citing Smith, 967 F.3d at 203).

Here, the Smith factors all confirm what common-sense counsels, namely that the agents' five-day delay between the seizure of Ortiz's device and obtaining the November Warrant was eminently reasonable and not a Fourth Amendment violation:

> **1. The Length of Delay.** Five business days is comfortably within the delays that courts in this circuit have found reasonable, and the defendant concedes that even 11 days is not considered unreasonable. See Ortiz Mot. at 38 (citing United States v. Martin, 157 F.3d 46, 54 (2d Cir. 1998) (11 days, including "two weekends and [] Christmas," was not "so 'unreasonable' as to violate the Fourth Amendment"); see also Tr. of Crim. Cause for Status Conf. at 16:17-19, United States v. Franco, No. 23-CR-394 (DG) (E.D.N.Y. Oct. 15, 2024) ("As to the first factor, the delay was 17 calendar days and 13 business days. I find that factor to be at worst neutral on the facts of this case."); United States v. Hiya, No. 24-CR-282 (VM), 2024 WL 5004586, at *4 (S.D.N.Y. Dec. 6, 2024) (delay of nine business days was neutral factor); United States v. Watson, No. 23-CR-82 (EK), 2023 WL 7300618, at *9 (E.D.N.Y. Nov. 6, 2023) (delay of 19 calendar days—13 business days—"weighs in favor of neither the government nor the defendant"); United States v. Kamaldoss, 2022 WL 1200776, No. 19-CR-543 (ARR), at *16 (E.D.N.Y. Apr. 22, 2022) (15-day delay including two weekends "should not weigh against the government"); Adeleke v. Johnson, No. 20-CV-5224 (MKB), 2022 WL 4226042, at *6 n.8 (E.D.N.Y. Sept. 13, 2022) ("[B]etween the May 29 Arrest and June 11, 2018, when Officer Johnson applied for the warrant, only thirteen days had passed. This constitutes 'a reasonable period of time.'" (quoting Martin, 157 F.3d at 54)); cf. United States v. Wells, No. 20-CR-633 (NRB), 2023 WL 2223474, at *3 (S.D.N.Y. Feb. 23, 2023) (delay of 29 calendar days favors defendant "only to a slight degree"). In this case, the agents obtained the November Warrant within one business week. This factor favors the government.
>
> **2. The Importance of the Seized Property.** While the government agrees with the defendant that under Smith, "personal electronic devices like a modern cell phone implicate 'special concerns' due to the immense amount of private material saved on electronic devices," Corbett, 2021 WL 4480626, at *5 (citing Smith, 967 F.3d at 207), "[n]onetheless, in evaluating the second Smith factor, courts have also considered whether defendants requested the property be returned[.]" Corbett, 2021 WL 4480626, at *5 (citing Smith, 967 F.3d at 207–08 (considering whether defendant had "alternative electronic devices that could serve the same functions" and whether defendant "request[ed] the return of the" device)). Here, the defendant has never sought the return of his cellphone since his arrest and its lawful seizure incident to arrest. Therefore, this factor favors the government. See, e.g., id. (concluding that second factor weighed in favor of government where defendant

had not requested return among other factors); United States v. Franzone, No. 21-CR-446 (VSB), 2025 WL 993112, at *7 (S.D.N.Y. Apr. 2, 2025) ("The delay in seeking the devices' return weighs against [the defendant] in evaluating the importance of the devices").

**3. The Defendant's Property Interest.** Where, as here, a phone is "lawfully seized incident to the defendants' arrest[] pursuant to [an] arrest warrant[]" a defendant has a "reduced property interest[] in the phone[]." Id. at *6. Accordingly, this factor also favors the government.

**4. The Government's Justification for the Delay.** Courts routinely consider the ongoing nature of an investigation in justifying a delay. See, e.g., Corbett, 2021 WL 4480626, at *6 ("[T]he court finds that the delay was reasonable in light of the government's continuing investigation."); Wells, 2023 WL 2223474, at *6 (justification favors government in part because government's "continued investigatory work . . . show[s] that they exercised some degree of overall diligence" (quoting United States v. Green, No. 18-CR-121 (RJA), 2021 WL 1877236, at *8 (W.D.N.Y. Feb. 3, 2021))). The pace of the investigation is demonstrated by, for example, the fact that on the same day they obtained the November Warrant, November 14, 2025, [redacted] six days later, November 20, 2025, [redacted] and five days after that, on November 25, 2025, [redacted][25] Thus, this factor also favors the government.

Finally, even if the Court were to conclude that the five-day delay was unreasonable and in violation of the Fourth Amendment, there is no basis to apply the exclusionary rule and suppress the evidence. Where "the court is devoid of evidence that the officers' delay in obtaining a search warrant was deliberate, reckless, or grossly negligent," nor is there "evidence of systemic

[25] The government seeks leave to file the portions highlighted in gray on an ex parte basis and provide the defense with a redacted copy. Courts have long recognized the need for ex parte communications "to maintain the integrity of ongoing investigations and the judicial process." United States v. Loera, No. 09-CR-466 (BMC), 2017 WL 2821546, at *2 (E.D.N.Y. June 29, 2017) (holding that ex parte submissions were appropriate when subject matter included "cooperating witnesses, confidential sources, ongoing investigations, or law enforcement techniques."). See also In re Grand Jury Subpoena dated Aug. 9, 2000, 218 F. Supp. 2d 544, 551 (S.D.N.Y. 2002) ("In considering whether to enforce a grand jury subpoena, ex parte submissions are acceptable if necessary to maintain grand jury secrecy."). Here, the government includes ex parte information relating to [redacted]

or recurring negligence," this Court has declined to exclude relevant evidence even where the delay was over one hundred days. Corbett, 2021 WL 4480626, at *7. As in Corbett, so too here.

C. The November Warrant Was Supported by Probable Cause for Both the Indictment Offenses and the Obstruction Offenses

"[T]he existence of the [i]ndictment supports a finding of probable cause to believe a crime was committed." United States v. Kostin, No. 24-CR-91 (GHW), 2025 WL 1504409, at *24 (S.D.N.Y. May 27, 2025) (collecting cases). The November Affidavit attached and incorporated the Indictment, which charged Ortiz with the Indictment Offenses. See Nov. Aff. ¶ 4 & Ex. 1 (the Indictment). The November Affidavit and the Indictment detailed the use of cellular telephones by Ortiz, Clase, and their co-conspirators to effectuate the pitch-rigging scheme underlying the Indictment Offenses. See Nov. Aff. ¶¶ 10–15 (citing Indictment ¶¶ 1, 34–36). Specifically, Ortiz had communicated with Clase via audio and text messages about his receipt of $5,000 as his kickback payment for throwing Subject Pitch-1. See Nov. Aff. ¶¶ 11–12 (citing Indictment ¶¶ 34–36). The text and audio messages discussed the transfer of 290,000 Dominican pesos, which equaled roughly $4,900. See id. In their messages, Clase and Ortiz specifically discussed the transfer of 90,000 Dominican pesos (out of the 290,000 pesos in kickback money). See id. The 90,000 pesos were transferred from Bettor-1 to Clase Associate-1 and then to Ortiz Associate-1. See id.; supra at 4–5. After the 90,000 pesos were transferred, Clase sent Ortiz an audio message directing Ortiz to tell Ortiz Associate-1 that the 90,000 was payment for a horse. See Nov. Aff. ¶¶ 11-12 (citing Indictment ¶¶ 34-36). Specifically, Clase told Ortiz, "They're going to ask him what is that payment for over there. Tell him that this is payment for a horse. Payment for a horse. You got that?" Ortiz responded, "Okay, perfect." See Indictment ¶ 36. Accordingly, there was probable cause to believe that Ortiz had engaged in the Indictment

Offenses and that evidence of the Indictment Offenses would be found on the device seized from Ortiz incident to his arrest.

Ortiz does not appear to dispute that there was probable cause to search for evidence of the Indictment Offenses—nor could he, given the grand jury indictment for those offenses, which also included specific communications via cellphone. Rather, he argues only that the November Affidavit lacked probable cause to search for evidence of the Obstruction Offenses.[26] See Ortiz Mot. at 35–36. Ortiz is wrong. The November Affidavit and the Indictment also provided probable cause to search Ortiz's device for evidence of the Obstruction Offenses. Specifically, the November Affidavit explained that just as Ortiz and Clase had agreed that Ortiz would falsely tell Ortiz Associate-1 that the kickback money was repayment for a horse, in order to obstruct the government's investigation, Ortiz had also told his attorneys and Ortiz Associate-2 [redacted] that same lie: that the 90,000 Dominican pesos Clase provided in the aftermath of Subject Pitch-1 was not a kickback, but was instead the repayment of money for a horse. See Nov. Aff. ¶¶ 12–15.

In September 2025, lawyers for Ortiz and Clase met with the government and repeated that same lie to the government in order to try and convince the government not to bring charges against Ortiz and Clase. See id. ¶ 13. In November 2025, agents interviewed Ortiz Associate-2, who claimed that he sold horses (including to Clase and Ortiz), had been friends with Ortiz for years, and that he had spoken with Ortiz and Clase a few days prior to speaking with the agents. See id. ¶ 14. Ortiz Associate-2 further claimed that while he had no documentation of it,

---

[26] Even if the Court were to agree with Ortiz that the November Affidavit did not establish probable cause for the Obstruction Offenses, because the evidence of obstruction would likewise be evidence of the fraud scheme, all evidence seized pursuant to the November Warrant was likewise properly seized as evidence of the fraud.

at some time in the recent past, Ortiz lent Clase 90,000 Dominican pesos to purchase a horse. See id. Furthermore, during their review of Ortiz's prior cellular telephone pursuant to the July Ortiz Warrant, law enforcement agents had observed text message communications between Ortiz and Ortiz Associate-2. See id. ¶ 15. For all of those reasons, there was also probable cause to believe that Ortiz had engaged in the Obstruction Offenses and that evidence of the Obstruction Offenses would be found on the device seized from Ortiz incident to his arrest.

Ortiz claims that the November Warrant was not supported by probable cause for the Obstruction Offenses because there was no reason to disbelieve the false exculpatory explanation provided by Ortiz's attorneys and Ortiz Associate-2 about the 90,000 pesos being payment for a horse. See Ortiz Mot. at 35–36. In so doing, Ortiz downplays the key fact that at the time the November Warrant was issued, he was under indictment for his role in the pitch-rigging scheme, including receiving the very kickback payment he tried to pass-off as the repayment for a horse. See Indictment ¶¶ 34–36. And while Ortiz claims that there was no reason to believe that evidence of the Obstruction Offenses would be found on his device, he ignores that the November Affidavit and the Indictment detailed Ortiz's use of cellular phones in the pitch-rigging scheme, the November Affidavit further explained that agents had observed text messages between Ortiz and Ortiz Associate-2 on the phone seized pursuant to the July Ortiz Warrant, and that Ortiz Associate-2 told agents that he had spoken to Ortiz and Clase a few days before he spoke with them. See Nov. Aff. ¶¶ 12–15; Indictment ¶¶ 34–36. All of this information was put before the Magistrate Judge, who concluded that the evidence supported probable cause to search Ortiz's phone for evidence of the Obstruction Offenses.

D. The November Affidavit Did Not Knowingly or Recklessly Omit Material Information from the November Affidavit Requiring a *Franks* Hearing

Ortiz does not argue that the November Affidavit contained any material misrepresentations, but only omissions, which, as noted above, "are not subject to the same high level of scrutiny as misstatements." Rivera, 750 F. Supp. at 617. "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." Rajaratnam, 719 F.3d at 154. While "every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly," "[i]f . . . this type of 'intentional' omission is all that Franks requires, the Franks intent prerequisite would be satisfied in almost every case." Id. "[Rather,] Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." Id. (emphasis in original).

Ortiz argues that the November Affidavit knowingly or recklessly omitted information that he claims would negate probable cause, namely (1) the statements by Ortiz Associate-1 and Ortiz Associate-2 to law enforcement about the 90,000 pesos kickback payment; and (2) false exculpatory statements by several of the Bettors denying knowledge of the pitch-rigging conspiracy. See Ortiz Mot. 39–40. As detailed below, the November Affidavit did not omit material information the inclusion of which would have negated probable cause, and neither of Ortiz's arguments has merit.

1. The November Affidavit Did Not Omit Material Information Related to Ortiz's Receipt of Kickback Money

Ortiz claims that the November Affidavit omitted to include that two witnesses—Clase Associate-1 and Clase Associate-2—told law enforcement agents that the 90,000 "Dominican pesos transaction was, indeed, for the purchase of a horse." See Ortiz Mot. at 39–40. Neither witness said that, and the November Affidavit properly included the relevant information.

With respect to Clase Associate-2, it is simply untrue that Clase Associate-2 was not "mentioned in the November Affidavit." Ortiz Mot. at 12. The November Affidavit explicitly detailed how Clase Associate-2 had told law enforcement agents that he understood that Ortiz had lent Clase 90,000 pesos for a horse at some point in the recent past (though, to be clear, he said nothing about the alleged repayment of that loan on June 19, 2025):

> Associate-2 stated, in sum and substance and in part, that he has been friends with Ortiz for years. Associate-2 stated that Ortiz and Clase have each bought horses from Associate-2. Associate-2 claimed that at some time in the recent past, Ortiz lent Clase 90,000 Dominican pesos to purchase a horse. Associate-2 had no records of the transaction. Associate-2 also noted that he had spoken with Ortiz and Clase a few days before speaking with law enforcement agents.

See Nov. Aff. ¶ 14. Based on the grand jury indictment that charged Ortiz and Clase with receiving this very kickback payment and lying that it was for a horse—it was reasonable for the November Affidavit to conclude that Clase Associate-2's statement was false and part of an obstruction scheme, and because the Magistrate Judge had the relevant information, he was not misled and was free to disagree with the conclusion in the Affidavit.

With respect to Clase Associate-1, his/her information was simply a recycling of the same self-serving false exculpatory lie from Clase; he/she did not have any firsthand information about the actual purpose of the payment. Clase Associate-1 told law enforcement agents that Clase told him/her that the payment was for a horse, which is consistent with the lie that Clase told Ortiz to tell Ortiz Associate-1: "They're going to ask him what is that payment for over there. Tell him that this is payment for a horse. Payment for a horse. You got that?" The fact that Clase told his associate a lie about the true purpose of the payment—rather than tell him/her that he was laundering criminal proceeds from a fixed pitch scheme—is not material information that needed to be included in the warrant. And if it had been included, in light of the Indictment

and in light of the other disclosures regarding the same self-serving false exculpatory made by Clase to others, it would have been cumulative and not have negated probable cause.

2. The November Affidavit Did Not Omit Any Material Information Related to the Bettors' False Exculpatory Statements

At the outset, the November Affidavit did not rely on a single witness statement to establish probable cause. Rather, the November Affidavit primarily relied on the Indictment for probable cause and expressly provided that it did not set forth all of the potentially relevant information, but only sufficient information to support probable cause: "This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter." See Nov. Aff. ¶ 3.

Ortiz argues that the November Affidavit was misleading because it omitted purportedly exculpatory statements by the following specific individuals: [redacted] see Ortiz Mot. at 12–14, 40. Ortiz is wrong. Franks does not obligate law enforcement agents to include every false exculpatory statement they encounter in a search warrant, especially where, as here, probable cause is primarily based on a grand jury's return of an indictment. See United States v. Ray, 541 F. Supp 3d 355, 384 (S.D.N.Y. 2021) (holding that a manipulated victim's favorable statements about the defendant and the statements' potential to exculpate his abuse of her were unnecessary to include in the search warrant because she had done so "as part of a scheme" to help the defendant); Mandell, 710 F. Supp. 2d at 383 (holding that an agent's omission in a warrant of defendant's occasional instruction to brokers to "be honest and comply with the law" did not have to be included). As detailed below to the extent there was any omission, it "was the result of a considered and reasonable judgment that the

information was not necessary to the . . . application.'" Clanton, 2024 WL 4854524, at *6 (quoting Rajaratnam, 719 F.3d at 155).

[redacted]

[redacted]

[redacted]

[redacted]

IV. The Vasquez Warrant Was Supported by Probable Cause

In his motion, Vasquez argues generally that the evidence in the Vasquez Affidavit was insufficient to establish probable cause because the facts in the Vasquez Affidavit do not satisfy the elements of wire fraud or demonstrate Vasquez's involvement in the scheme. See Vasquez Mot. at 8. However, the Vasquez Affidavit incorporated the criminal complaint against him for wire fraud conspiracy, the indictment against Clase and Ortiz for wire fraud conspiracy, and Vasquez's own admission, among other evidence. See Vasquez Aff. ¶¶ 16–36. In its totality, the Vasquez Affidavit provided substantial evidence supporting the Magistrate Judge's conclusion that there was a reasonable probability both that Vasquez had been a participant in the pitch-rigging scheme, that he had used a cellular telephone in furtherance of the scheme, and that evidence of all of the Vasquez Offenses—not just wire fraud, but a whole host of other applicable crimes that Vasquez does not challenge—would be found on the Vasquez Devices. Accordingly, Vasquez's motion to suppress should also be denied.

V. Law Enforcement Agents Relied on the Warrants in Good Faith

A. Applicable Law

The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation" of its terms. United States v. Leon, 468 U.S. 897, 906 (1984). Even where probable cause is lacking, suppression is a "last resort, not [a] first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006). It is appropriate only where it deters "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Herring v. United States, 555 U.S. 135, 144 (2009). The exclusionary rule developed as "a prudential

remedy, crafted by the Supreme Court," United States v. Raymonda, 780 F.3d 105, 117 (2d Cir. 2015) (internal quotation marks omitted), and it is neither a "personal constitutional right" nor a means "to redress the injury occasioned by an unconstitutional search," Davis v. United States, 564 U.S. 229, 237 (2009) (internal quotation marks omitted). Rather, the "sole purpose" of the exclusionary rule is to deter "future Fourth Amendment violations." Id. at 236–37. The rule was "designed to deter police misconduct rather than to punish the errors of judges and magistrates." Leon, 468 U.S. at 916.

"Application of the exclusionary rule depends on the 'efficacy of the rule in deterring Fourth Amendment violations in the future' as well as a determination that 'the benefits of deterrence . . . outweigh the costs.'" United States v. Rosa, 626 F.3d 56, 64 (2d Cir. 2010) (quoting Herring, 555 U.S. at 141). Accordingly, "'[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct.'" Id. (quoting Herring, 555 U.S. at 143). A reviewing court will therefore "look to whether 'police conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" Id. (quoting Herring, 555 U.S. at 144). "'The pertinent analysis of deterrence and culpability is objective,' and '[this Court's] good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" Id. (quoting Herring, 555 U.S. at 145).

The Supreme Court has explained that suppression is "an appropriate remedy" for evidence seized pursuant to a search warrant only where (i) "the magistrate . . . was misled by information . . . that the affiant knew was false or would have known was false except for his reckless disregard of the truth," (ii) "the issuing magistrate wholly abandoned his judicial role,"

such that "no reasonably well trained officer should rely on the warrant," (iii) the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (iv) the warrant is "so facially deficient," for example, by "failing to particularize the place to be searched or the things to be seized," that the executing officers "cannot reasonably presume it to be valid." Leon, 468 U.S. at 923.

B. Discussion

Here, even if the Court were to find that the Subject Warrants were not supported by probable cause—which they were—the agents who executed the searches reasonably acted in good faith in reliance on the Subject Warrants and therefore the fruits of the Warrants should not be suppressed. Ortiz and Clase argue for exclusion based on the first and third Leon factors: they claim that the affidavits in support of the Subject Warrants were affirmatively misleading and omitted information and were so lacking in indicia of probable cause as to render reliance unreasonable. See Ortiz Mot. at 33–34. On the contrary, the affidavits in support of the Subject Warrants set forth a number of links between the defendants' conduct and electronic devices, and with respect to the November Warrant and the Vasquez Warrant, incorporated by reference a detailed indictment and complaint, respectively. The Affidavits certainly were not "totally devoid of factual" support or "completely bare bones." United States v. Clark, 638 F.3d 89, 103–04 (2d Cir. 2011). The Warrants themselves complied with the particularity requirement of the Fourth Amendment and were not overbroad, and there are no blatant deficiencies on the face of the Warrants that would defeat the agents' good-faith reliance on them. Moreover, for the reasons detailed throughout this memorandum, nothing in the affidavits in support of the Subject Warrants constituted an attempt to mislead the magistrate by information that the affiant "knew was false or would have known was false except for his reckless disregard of the truth," Leon, 468 U.S. at 923, and thus suppression is not warranted.

CONCLUSION

For the reasons described above, the defendants' motions to suppress should be denied in their entirety.

Dated: Brooklyn, New York
June 12, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: /s/ Eric Silverberg
Eric Silverberg
Sean M. Sherman
Sarah M. Evans
Assistant United States Attorneys
(718) 254-7000